THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: August 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Vans, Inc.*
*v.*
*Branded, LLC*

————

Cancellation No. 92066859
Cancellation No. 92066876
(Consolidated)

————

Christopher B. Lay and Dermot J. Horgan of IPHORGAN Ltd.,
    for Vans, Inc.

Jeffrey M. Furr of Furr Law Firm IP,
    for Branded, LLC.

————

Before Bergsman, Larkin, and English,
    Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Branded, LLC ("Respondent") owns two Principal Register registrations for the mark OLD SCHOOL, in typed drawing form,[1] for the goods listed below, both in International Class 25:

---

[1] A mark depicted as a typed drawing is the legal equivalent of a standard character mark. *See In re Viterra Inc.*, 671 F.3d 1358, 1010 USPQ2d 1905, 1909 n.2 (Fed. Cir. 2012) ("until 2003, 'standard character' marks formerly were known as 'typed' marks.").

> Men's and ladies' clothing, namely jackets, raincoats, trousers, suits, sport coats, socks, sweaters, jeans, blazers, scarves, neckties, pajamas, swimwear, shorts, shoes, belts and skirts;[2] and
>
> Men's and ladies' shirts.[3]

In its Third Amended [Consolidated] Petition for Cancellation, Vans, Inc. ("Petitioner") seeks cancellation of Respondent's registrations on the grounds of abandonment based on (i) nonuse with no intent to resume use, (ii) an assignment in gross, (iii) an invalid assignment because the assignor was a nonexistent entity, and (iv) naked licensing.[4]

In its Answer, Respondent denied the salient allegations of the operative Third Amended [Consolidated] Petition for Cancellation.

As discussed in more detail below, we find that Respondent abandoned the OLD SCHOOL mark for the registered goods through nonuse with an intent not to resume. We thus do not reach whether the mark was abandoned through an invalid assignment, an assignment in gross, or naked license.

---

[2] Registration No. 1915132 registered August 29, 1995; second renewal. The underlying application Serial No. 74574444 was filed September 16, 1994.

[3] Registration No. 1387606 registered March 25, 1986; second renewal. The underlying application Serial No. 73556309 was filed August 30, 1985.

[4] 24 TTABVUE.

Petitioner petitioned to cancel on the grounds of partial abandonment and fraud. As discussed in the procedural background section, the partial abandonment claim is moot and Petitioner has not pursued the fraud claim. Petitioner's Brief, p. 22 (85 TTABVUE 23).

Citations to the record and briefs refer to TTABVUE, the Board's online docket system. *See, e.g., New Era Cap Co., Inc. v. Pro Era, LLC*, 2020 USPQ2d 10596, at *2 n.1 (TTAB 2020).

## I.    Procedural Background

The Board, in its January 24, 2018 order, consolidated Cancellation Nos. 92066859, 92066871, and 92066876.[5] Later, the Board granted Petitioner's motion for summary judgment in Cancellation No. 92066871 on the ground of abandonment, finding no genuine dispute of material fact that Respondent abandoned the mark OLD SCHOOL CLOTHING CO., in typed drawing form, for "retail store services in the field of clothing and accessories," through nonuse and an intent not to resume use, and entered judgment against Respondent, cancelling Registration No. 1570438.[6] In discussing the record as it relates to the two remaining proceedings, we refer to the record in the parent proceeding, Cancellation No. 92066859.

In addition, in its June 30, 2020 order, the Board granted Petitioner's motion for partial summary judgment in Cancellation Nos. 92066859 and 92066876 on the ground of abandonment finding no genuine dispute of material fact that Respondent never sold swimwear, shoes, skirts, pajamas, or ladies' shirts,[7] and had no intent to commence use or resume use after Respondent acquired the marks and registrations.[8] Accordingly, the Board held,

---

[5] 6 TTABVUE 1-2.

[6] 18 TTABVUE 8-9.

[7] 35 TTABVUE 19 and 21.

[8] 35 TTABVUE 25.

> Proceedings will go forward solely with respect to the remaining goods in involved Registration Nos. [1915132 and 1387606], which are the subject[s, respectively] of consolidated Cancellation Nos. 92066859 and 9206687.[9]

The remaining goods at issue are as follows:

> Men's and ladies' clothing, namely jackets, raincoats, trousers, suits, sport coats, socks, sweaters, jeans, blazers, scarves, neckties (Registration No. 1915132); and

> Men's shirts (Registration No. 1387606).[10]

## II.   Evidentiary Issues

### A.   Whether the discovery deposition of Scott Kuhlman is admissible.

On October 11, 2020, Petitioner filed a motion under to Trademark Rule 2.120(k)(2), 37 C.F.R. § 2.120(k)(2), to admit into evidence the discovery deposition of Scott Kuhlman, a third-party witness, based on exceptional circumstances and the interests of justice.[11] According to Petitioner, Kuhlman's testimony is essential because his company "is the only entity purported to have used Respondent's OLD

---

[9] 35 TTABVUE 26.

[10] Thus, we did not consider any testimony the parties introduced or arguments the parties made in their briefs regarding Respondent's use of its OLD SCHOOL trademark on pajamas, swimwear, shoes, skirts, and ladies' shirts. *See e.g.*, Kuhlman Testimony Dep. (September 14, 2020), pp. 29-30 (44 TTABVUE 30-31) (discussing OLD SCHOOL CLOTHING CO.); *id.* at pp. 31-33 (44 TTABVUE 32-34) (retail sales and advertising for retail sales under the OLD SCHOOL CLOTHING CO. trademark); *id.* at p. 35 (44 TTABVUE 36) (OLD SCHOOL CLOTHING CO. trademark used in connection with retail sales); *id.* at p. 42 (44 TTABVUE 43) (ladies' shirts); *id.* at p. 65 (44 TTABVUE 66) (pajamas); *id.* at pp. 66-67 (44 TTABVUE 67-68) (swimwear); *id.* at pp. 70-71 (44 TTABVUE 71-72) (swimwear shoes); *id.* at pp. 73-74 (44 TTABVUE 74-75) (skirts); Kuhlman Testimony Dep. (August 16, 2021), p. 54 (82 TTABVUE 57) (shoes).

[11] 47 TTABVUE.

SCHOOL marks and, therefore, his testimony is central to Petitioner's abandonment claims."[12]

A summary of the relevant procedural history is helpful:[13]

● Petitioner deposed Scott Kuhlman during discovery on June 20, 2018.

● On July 27, 2020, Petitioner served on Respondent its Pretrial Disclosures.

● One of the witnesses Petitioner disclosed was Scott Kuhlman.

● Before serving the Pretrial Disclosures, Petitioner inquired whether Respondent would stipulate to admitting into evidence the Kuhlman discovery deposition transcript.

● The parties discussed the stipulation until after Petitioner served its Pretrial Disclosures.

● On August 12, 2020, counsel for Respondent notified Petitioner's counsel by email that Respondent would not stipulate to admitting into evidence the Kuhlman discovery deposition transcript.

● On September 14, 2020, Petitioner deposed Scott Kuhlman during Petitioner's trial period.

● Counsel for Petitioner marked Kuhlman's discovery deposition transcript as Exhibit 1 to his trial testimony deposition and used it to impeach his new testimony

---

[12] 47 TTABVUE 2.

[13] 47 TTABVUE 2-4.

on numerous occasions, each time reading into the record the earlier testimony and asking Kuhlman to confirm that it was read correctly.[14]

In sum, Petitioner hoped to use just the discovery deposition, if Respondent would stipulate to its admission. Since Respondent did not stipulate to the admission of Kuhlman's discovery deposition when Petitioner was at the point of preparing for trial, Petitioner disclosed that it might take testimony from the witness. After Respondent refused to stipulate to the introduction of Kuhlman's discovery deposition, Petitioner took Kuhlman's testimony deposition; the witness provided testimony unfavorable to Petitioner, so during the testimony deposition Petitioner used the discovery deposition to impeach the witness, who had changed his story.

Petitioner asserts that it timely filed the motion to admit the discovery deposition once it learned Respondent would not stipulate to admitting it.[15]

With regard to the exceptional circumstances and interest of justice, Petitioner contends that Kuhlman's discovery deposition and testimony deposition were so different that Petitioner did not have time to impeach Kuhlman regarding every inconsistency.[16]

---

[14] *See e.g.*, Kuhlman Testimony Dep. (September 14, 2020), pp. 27, 67, 71, and 73 (44 TTABVUE 28, 68, 72, and 74).

Scott Kuhlman did not authenticate the discovery deposition. *Id.* at pp. 3-4 (44 TTABVUE 4-5).

Petitioner impeached the witness a second time during Respondent's testimony deposition of Scott Kuhlman. *See e.g.,* 82 Kuhlman Testimony Dep. (August 16, 2021), pp. 64 and 77 (82 TTABVUE 67 and 80).

[15] 47 TTABVUE 5.

[16] 47 TTABVUE 4.

> Kuhlman's purported use of OLD SCHOOL in connection with the goods identified in the OLD SCHOOL registrations at issue in this case is central to Petitioner's abandonment claim: Petitioner believes that Kuhlman's testimony is unreliable and self-serving. The only way the Board will be able to review the entire picture, and assess Kuhlman's credibility, is if it has access to all of Kuhlman's testimony, including his discovery deposition. Thus, this case involves exceptional circumstances warranting admission of the non-party Scott Kuhlman's discovery deposition into evidence.[17]

The discovery deposition of a third-party witness may not be offered in evidence except by stipulation of the parties or by order of the Board on motion under specific circumstances. Trademark Rule 2.120(k)(2), 37 C.F.R. § 2.120(k)(2), requires, in essence, that the party seeking to rely on a discovery deposition of a third-party witness for purposes of trial make an affirmative showing at the time of the proffer of such evidence that circumstances exist that justify acceptance of the evidence, unless the party is invoking "exceptional circumstances," in which case the motion must be filed promptly after the party learns of the circumstances. *See Azalea Health Innovations, Inc. v. Rural Health Care, Inc.*, 125 USPQ2d 1236, 1240 (TTAB 2017); *Hilson Rsch. Inc. v. Soc'y for Hum. Resource Mgmt.*, 27 USPQ2d 1423, 1426-27 (TTAB 1993); *Nat'l Fidelity Life Ins. v. Nat'l Ins. Trust*, 199 USPQ 691, 692 n.4 (TTAB 1978) (no special circumstances shown to admit discovery deposition of non-party); *Insta-Foam Prods., Inc. v. Instapak Corp.*, 189 USPQ 793, 795 n.4 (TTAB 1976) ("Ordinarily, the discovery deposition of a nonparty witness cannot be relied upon in an opposition proceeding except as provided in Rule 32 FRCP."). *Cf. Fort Howard*

---

[17] 47 TTABVUE 6.

*Paper Co. v. G.V. Gambina Inc.*, 4 USPQ2d 1552, 1555 (TTAB 1987) (no special circumstances shown by applicant to admit discovery deposition of applicant's president).

Trademark Rule 2.120(k)(6), 37 C.F.R. § 2.120(k)(6), reads, in relevant part, that "Paragraph (k) of this section will not be interpreted to preclude reading or use of … a discovery deposition … as part of the examination or cross-examination of any witness during the testimony period of any party." However, Petitioner's use of the discovery deposition to impeach Scott Kuhlman during his testimony deposition does not automatically make the entire discovery deposition transcript of record. Accordingly, we find that the Board erroneously held in its previous ruling that Petitioner's motion to admit the Kuhlman discovery deposition was moot because it was marked for use in Kuhlman's discovery deposition and, therefore, is in the trial record.[18] *See* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 518 (2022) ("[T]he Board may, on its own initiative, reconsider and modify one of its orders or decisions if it finds error therein.") (citing *Avedis Zildjian Co. v. D. H. Baldwin Co.*, 181 USPQ 736, 736 (Comm'r 1974) ("The Board may on its own initiative reconsider and modify one of its decisions if it finds error.")).

Respondent objected to the admission of the Kuhlman discovery deposition in both Petitioner's testimony deposition of Kuhlman (44-45 TTABVUE) and Respondent's testimony deposition of Kuhlman (82 TTABVUE).[19] This returns us to the original

---

[18] 57 TTABVUE 5-6.

[19] 90 TTABVUE 53-54.

issue: whether exceptional circumstances or the interest of justice requires admitting the discovery deposition.

We see no exceptional circumstances that warrant the admission of the Kuhlman discovery deposition. We recognize that there are vast differences between his testimony in the discovery deposition and the testimony depositions. Nevertheless, when Petitioner was preparing and filing its pretrial disclosures, Petitioner knew that Respondent had not consented to admitting the discovery deposition, presumably because it was so damaging to Respondent that the Board granted in part Petitioner's two motions for summary judgment discussed above based in part on the deposition. Thus, it was incumbent upon Petitioner to prepare for an examination that might require extensive impeachment considering Kuhlman's close business relationship with Respondent.

In this regard, we note that Petitioner effectively impeached Kuhlman where his testimony deposition diverged from his discovery deposition. An additional 212 pages of discovery deposition testimony needlessly presents cumulative evidence.[20]

---

[20] By calling Kuhlman during its testimony period, Petitioner was effectively going to be cross-examining him. Citing a witness's prior testimony where necessary to impeach is a fundamental part of cross-examination. Petitioner did not identify those portions of the Kuhlman discovery deposition it wished to admit into the record. It would have helped our review of Petitioner's position if Petitioner had highlighted the testimony is was seeking to rely on. *See Illyrian Import, Inc. v. ADOL Sh.p.k.*, 2022 USPQ2d 292, at *10 (TTAB 2022) ("It is not enough that Applicant merely refers in a cursory manner to Opposer's claimed failure to comply with discovery requests and then leaves it to the Board to figure out which of the witness's documents should have been produced in response to specific document requests.") (citing *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) ("It is not enough to merely mention a possible argument in the most skeletal way, leaving the court to do counsel's work."); *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (same); *U.S. v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a

We deny Petitioner's motion to admit into evidence Scott Kuhlman's discovery deposition and sustain Respondent's objection to admission of his discovery deposition in toto. However, we will consider the Kuhlman discovery deposition for the limited purpose of impeachment. *See, e.g., Azalea Health Innovations v. Rural Health Care*, 125 USPQ2d at 1240 (discovery depositions may be used to impeach trial testimony of witnesses).

### B. Respondent's failure to produce documents.

To emphasize Respondent's failure to have used the OLD SCHOOL marks, Petitioner, in its brief, notes that Respondent failed to produce **any** documents in this case in response to Petitioner's request for production of documents even though Respondent said in response to multiple requests that **it would produce documents to the extent they are available**.[21] Respondent responded in that manner to the following requests:

● Petitioner's document Request Nos. 5 and 6 requesting documents from Respondent and Global Brand Group, LLC ("GBG") (Respondent's predecessor-in-interest) "relating to or concerning the units sold, dollar amount sold or both of goods sold under the OLD SCHOOL Marks";[22]

---

possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. As we recently said in a closely analogous context: Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace.'")).

[21] Petitioner's Brief, pp. 13, 24 (85 TTABVUE 14, 25).

[22] 41 TTABVUE 45-46.

● Petitioner's document Request No. 17 requesting "[a]ny and all documents exchanged between Scott Kuhlman, Keith Johnston, [Respondent], or [GBG], or any combination thereof, relating to or concerning the sale by Kuhlman Co., Scott Jmes Stores, or their successors in interest of goods under the OLD SCHOOL Marks";[23] and

● Petitioner's document Request No. 18 requesting "[a]ny and all documents exchanged between Scott Kuhlman and Keith Johnston, [Respondent], or [GBG], or any combination therefore, relating to use in U.S. commerce of the OLD SCHOOL Marks."[24]

In other words, Petitioner contends that Respondent failed to produce the documents it promised to provide and that we can and should infer from the failure to produce the documents that they are not "available," i.e., do not exist. If Petitioner believed Respondent's responses to Petitioner's discovery requests were inadequate, it was incumbent upon Petitioner to file a motion to compel adequate responses. Because Petitioner did not file such a motion, we will not consider Petitioner's complaints regarding the sufficiency of Respondent's responses. *See Midwestern Pet Foods Inc. v. Societe des Produits Nestle S.A.*, 685 F.3d 1046, 103 USPQ2d 1435, 1439 (Fed. Cir. 2012) (Board did not abuse its discretion by refusing to strike plaintiff's evidence where defendant failed to follow up on plaintiff's offer to produce the evidence at a mutually agreeable time and place and in view of defendant's failure to

---

[23] 41 TTABVUE 48.

[24] 41 TTABVUE 48.

file a motion to compel); *H.D. Lee Co. v. Maidenform Inc.*, 87 USPQ2d 1715, 1719 (TTAB 2008) (party that receives response it believes inadequate but fails to file a motion to test sufficiency of response, may not thereafter complain about its insufficiency); *Time Warner Entm't Co. v. Jones*, 65 USPQ2d 1650, 1656 (TTAB 2002) (having failed to file motion to compel, defendant will not later be heard to complain that interrogatory responses were inadequate).

### C. Scott Kuhlman's failure to comply with document requests in two subpoenas duces tecum.

Again, Petitioner wants us to infer that Scott Kuhlman's failure to produce documents that corroborate his testimony is probative of Respondent's failure to use the OLD SCHOOL marks. As discussed above and below, Kuhlman is a third-party witness whose companies are the sole purported authorized users of the OLD SCHOOL trademark.[25] Petitioner conducted Kuhlman's discovery deposition on June 20, 2018, pursuant to a subpoena duces tecum.[26] Subsequently, Petitioner deposed Kuhlman on September 14, 2020, during Petitioner's testimony period, pursuant to a subpoena duces tecum.[27] The documents requested at both depositions were the same.[28]

In preparation for his first testimony deposition, Kuhlman looked through old computer files "just trying to find any documentation I could possibly find to recall

---

[25] Johnston Discovery Dep., p. 17-19 (39 TTABVUE 19-21).

[26] Kuhlman Testimony Dep., Exhibit 1 (September 14, 2020) (44 TTABVUE 497-505).

[27] Kuhlman Testimony Dep., Exhibits 2 and 3 (September 14, 2020) (44 TTABVUE 597-606).

[28] Kuhlman Testimony Dep., (September 14, 2020) p. 178 (44 TTABVUE 179).

anything I possibly could."[29] Kuhlman did not bring any documents to the deposition even though some documents might have existed and Kuhlman, at some point, possibly had seen them,[30] including plans to use the OLD SCHOOL trademark.[31] Initially, at his discovery deposition, Kuhlman testified that there were no documents relating to or concerning goods sold.[32] At his first testimony deposition, Kuhlman testified that he had more documents in his "years of files" than the documents he produced at his discovery deposition, but that he did not know whether those files were in his possession.[33]

Kuhlman had, in fact, produced a few documents in this case, as Petitioner noted in its brief. These were produced during his second testimony deposition.

> Kuhlman has produced few documents in this case and none demonstrating use of OLD SCHOOL in U.S. commerce, and his testimony has been inconsistent on several material points. Despite receiving a subpoena duces tecum along with the notice of deposition for his September 2020 testimony deposition taken by [Petitioner], he did not bring any documents to the deposition. (44 TTABVUE 8, 25-41, 7:10-16, 24:19-40:12; *id*. 597, 600, Exs. 2-3.) Kuhlman alleges that certain responsive documents exist, but that he is unable to find them or has no idea where they are. (*See, e.g.*, 44 TTABVUE 37-38, 36:16-37:11.) And Kuhlman does not know where his documents are stored or how. (82 TTABVUE 71-72, 105, 68:19-69:24, 102:1-21.).[34]

---

[29] Kuhlman Testimony Dep. (September 14, 2020), pp. 5-6 (44 TTABVUE 6-7).

[30] *Id*. at pp. 6 and 26-40 (44 TTABVUE 7 and 27-41). Scott Kuhlman did not sign the deposition, nor did he complete the errata sheet.

[31] Kuhlman Testimony Dep. (September 14, 2020), p. 39 (44 TTABVUE 40).

[32] Kuhlman Testimony Dep. (September 14, 2020), p. 27 (44 TTABVUE 28).

[33] Kuhlman Testimony Dep. (September 14, 2020), pp. 30-31 (44 TTABVUE 31-32).

[34] Petitioner's Brief, p. 14 (85 TTABVUE 15).

If Petitioner was dissatisfied with Kuhlman's response to Petitioners' subpoena duces tecum, Petitioner's recourse was to seek enforcement from the United States District Court that issued the subpoena. The Board has no jurisdiction over depositions taken by subpoena. *See Ate My Heart, Inc. v. GA GA Jeans Ltd.*, 111 USPQ2d 1564, 1565 n.5 (TTAB 2014) (notice of deposition of unwilling non-party witness must include subpoena, and related motions must be filed with district court that issued subpoena, not Board); *HighBeam Mktg. LLC v. Highbeam Rsch. LLC*, 85 USPQ2d 1902, 1906 (TTAB 2008) (to effect compliance by a recalcitrant witness, it is incumbent on party to return to the court with jurisdiction over the subpoena); *PRD Elecs. Inc. v. Pacific Roller Die Co.*, 169 USPQ 318, 319 n.3 (TTAB 1971) (opposer's allegation in its brief that applicant defied a subpoena to produce witnesses is a matter opposer should have pursued before the court that issued the subpoena).

Because Petitioner did not seek enforcement of its subpoena duces tecum at the district court, we will not draw any adverse inferences from Kuhlman's failure to produce documents at his first testimony deposition (i.e., Kuhlman's failure to produce documents does not ipso facto mean he did not sell OLD SCHOOL brand clothing). *Midwestern Pet Foods*, 103 USPQ2d at 1439*; H.D. Lee*, 87 USPQ2d at 1719*; Time Warner Entm't*, 65 USPQ2d at 1656. While we do not draw any such inferences, we note that "[t]he presence of business records would strengthen the case that these transactions occurred in the ordinary course of trade, and the absence of such records does the opposite." *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ 2d 1043,

1053 (TTAB 2017). This is especially true where the testimony of the witness is not clear and definite. *See Jim Dandy Co. v. Martha White Foods, Inc.*, 458 F.2d 1397, 173 USPQ 673, 676 (CCPA 1972) (rejecting proffered showing of use in commerce based on witness testimony that was "far from clear and definite"). *Cf. Rsch. in Motion Ltd. v. NBOR Corp.*, 92 USPQ2d 1926, 1930 (TTAB 2009) (lack of documentation contributes to finding lack of bona fide intent to use a mark); *Commodore Elecs. Ltd. v. CBM Kabushiki Kaisha*, 26 USPQ2d 1503, 1507 (TTAB 1993) (without countervailing facts, "the absence of any documentary evidence on the part of an applicant regarding such intent is sufficient to prove that the applicant lacks a bona fide intention to use its mark in commerce as required by Section 1(b)"). Thus, we will consider Kuhlman's failure to produce documents relating to his use of the OLD SCHOOL mark in considering the reliability of his testimony regarding the use of the OLD SCHOOL mark (i.e., if Kuhlman sold OLD SCHOOL brand clothing, he should have documents proving sales, but if he does not have documents proving such sales, it is less likely he sold those products). *Executive Coach Builders, Inc. v. SPV Coach Co.*, 123 USPQ2d 1175 (TTAB 2017) ("Oral testimony is strengthened by corroborative documentary evidence.").

## III.    The Record

The record includes the pleadings, and under Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), Respondent's registration files, as well as the following materials:

### A.    Petitioner's testimony and evidence.

1. Notice of reliance on the discovery deposition of Keith Johnston, the owner, sole member, and Chief Executive Officer of Respondent;[35]

2. Notice of reliance on Respondent's initial disclosures;[36]

3. Testimony declaration of Christopher Lay, Petitioner's counsel,[37] including Respondent's responses to Petitioner's first set of interrogatories,[38] and Respondent's responses to Petitioner's first set of requests for production of documents,[39] and the first three pages of a GOOGLE search for "Scott Kuhlman AND Old School";[40]

4. Testimony declaration of David Solomon, Petitioner's Vice President of Global Footwear;[41]

5. Testimony declaration of Inês Klinesmith, Investigator at Bishop IP Investigations;[42] and

6. Testimony deposition of Scott Kuhlman (September 14, 2020).[43]

## B. Respondent's testimony and evidence.

1. Notice of reliance on a copy of Petitioner's pleaded application Serial No. 87154398, printed from the USPTO Trademark Status and Document (TSDR) system, for the mark OLD SKOOL, in standard characters, for "all-purpose carrying bags, purses, shoulder bags, hang bags, beach bags, messenger bags, overnight bags, backpacks; and wallets," in International Class 18, and "footwear; Clothing, namely, shirts, t-shirts, tank tops, sweaters, jackets, shorts, board shorts, swimwear, and underwear;

---

[35] 39 TTABVUE 6-255. The Board posted the portions of the Johnston discovery deposition designated confidential at 40 TTABVUE.

[36] 39 TTABVUE 257-262.

[37] 41 TTABVUE 39-51.

[38] 41 TTABVUE 28-40.

[39] 41 TTABVUE 61-99.

[40] 41 TTABVUE 101-106.

[41] 42 TTABVUE.

[42] 43 TTABVUE.

[43] 44-45 TTABVUE. The Board posted the portions of the Kuhlman Testimony Deposition (September 14, 2020) designated confidential at 46 TTABVUE.

headwear; pants, jeans, leggings, skirts, dresses, socks, belts, scarves, gloves," in International Class 25;[44]

2. Notice of reliance on copies of oppositions Respondent filed against third parties attempting to register the mark OLD SCHOOL;[45]

3. Notice of reliance on a copy of the complaint filed by Respondent against Petitioner in the U.S. District Court Central District of California, Case No. 8:20-cv-02085 (October 28, 2020);[46]

4. Notice of reliance on the discovery deposition of Vicki Redding, Petitioner's Vice President of Apparel and Accessories for Global Product;[47]

5. Notice of reliance on the discovery deposition of David Solomon;[48]

6. Testimony deposition of Scott Kuhlman (August 16, 2021);[49] and

7. Testimony deposition of Keith Johnston.[50]

### C. Petitioner's rebuttal testimony.

Petitioner introduced the rebuttal testimony declaration of Christopher Lay.

## IV. Entitlement to a Statutory Cause of Action

A plaintiff's entitlement to invoke a statutory cause of action for opposition or cancellation is a necessary element in every inter partes case. *Corcamore, LLC v.*

---

[44] 66 TTABVUE.

[45] 67-74 TTABVUE.

[46] 75 TTABVUE.

[47] 76-77 TTABVUE. The Redding deposition was improperly designated, in its entirety, as "highly confidential." None of the testimony was confidential, let alone highly confidential. Pursuant to Trademark Rule 2.116(g), we treat the testimony as not confidential.

[48] 80 TTABVUE. Respondent designated a portion of the Solomon deposition "highly confidential" but failed to introduce that portion of the deposition into evidence.

[49] 82 TTABVUE.

[50] 83 TTABVUE.

*SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at \*6-7 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671 (2021). To establish entitlement to a statutory cause of action under Trademark Act Section 14, 15 U.S.C., § 1064, a plaintiff must demonstrate "an interest falling within the zone of interests protected by the statute and … proximate causation." *Corcamore*, 2020 USPQ2d 11277, at \*4 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 109 USPQ2d 2061, 2067-70 (2014)).[51] Stated another way, a plaintiff is entitled to bring a statutory cause of action by demonstrating a real interest in the proceeding and a reasonable belief of damage. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at \*3 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82 (2021); *see also Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014).

There is "no meaningful, substantive difference between the analytical frameworks expressed in *Lexmark* and *Empresa Cubana.*" *Corcamore*, 2020 USPQ2d 11277, at \*4. Thus, "a party that demonstrates a real interest in cancelling a trademark under § 1064 has demonstrated an interest falling within the zone of interests protected by § 1064. … Similarly, a party that demonstrates a reasonable belief of damage by the registration of a trademark demonstrates proximate causation within the context of § 1064." *Corcamore*, 2020 USPQ2d 11277, at \*7.

---

[51] Our decisions have previously analyzed the requirements of Trademark Act Sections 13 and 14, 15 U.S.C. §§ 1063-64, under the rubric of "standing." We now refer to this inquiry as entitlement to a statutory cause of action. Despite the change in nomenclature, our prior decisions and those of the Federal Circuit interpreting Trademark Act Sections 13 and 14 remain applicable. *Spanishtown Enters., Inc. v. Transcend Res., Inc.*, 2020 USPQ2d 11388, at \*2 (TTAB 2020).

Petitioner has made of record a copy of the May 24, 2017 final refusal to register the mark OLD SKOOL shown in Petitioner's application Serial No. 87154398 based on Respondent's Registration Nos. 1915132 and 1387606, both for the mark OLD SCHOOL in typed drawing form.[52] Because the USPTO refused to register Petitioner's mark OLD SKOOL by citing Respondent's registrations as a bar to registration, Petitioner has established its entitlement to a statutory cause of action against the cited registrations. *See, e.g.*, *Empresa Cubana Del Tabaco*, 111 USPQ2d at 1062 (because the USPTO refused to register plaintiff's application based on defendant's registrations, plaintiff has a real interest in cancelling the registrations and a reasonable belief the registrations are causing it damage); *TPI Holdings, Inc. v. Trailertrader.com, LLC*, 126 USPQ2d 1409, 1413 (TTAB 2018) (standing established by USPTO Office Action suspending application pending possible refusal to register based on alleged likelihood of confusion); *Great Seats Ltd. v. Great Seats, Inc.*, 84 USPQ2d 1235, 1237 (TTAB 2007).

## V.   Abandonment

### A.   Applicable Law

Under Section 45 of the Trademark Act, a mark shall be deemed abandoned

> When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

---

[52] Lay Decl. Exhibit G (41 TTABVUE 92-99).

15 U.S.C. § 1127.[53]

Since we presume a registration is valid, 15 U.S.C. § 1057(b), the party seeking its cancellation must rebut this presumption by a preponderance of the evidence. *Cold War Museum v. Cold War Air Museum*, 586 F.3d 1352, 92 USPQ2d 1626, 1628 (Fed. Cir. 2009); *W. Fla. Seafood Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1665-66 (Fed. Cir. 1994).

> If plaintiff can show three consecutive years of nonuse, it has established a prima facie showing of abandonment, creating a rebuttable presumption that the registrant has abandoned the mark without intent to resume use. The burden of production (i.e., going forward) then shifts to the respondent to produce evidence that it has either used the mark or that it has intended to resume use (e.g., a convincing demonstration of "excusable non-use" that would negate any intent not to resume use of the mark). The burden of persuasion remains with the plaintiff to prove abandonment by a preponderance of the evidence.

*Noble House Home Furnishings, LLC v. Floorco Enters., LLC*, 118 USPQ2d 1413, 1417 (TTAB 2016) (citing *Imperial Tobacco Ltd. v. Philip Morris Inc.*, 899 F.2d 1575, 14 USPQ2d 1390, 1393 (Fed. Cir. 1990)).

"Abandonment is a question of fact." *Quality Candy Shoppes/Buddy Squirrel of Wisc., Inc. v. Grande Foods*, 90 USPQ2d 1389, 1393 (TTAB 2007). "[A]s is true with most issues of trademark law, the determination of abandonment is peculiarly dependent on the facts of each particular situation and remarks in prior opinions are

---

[53] The Trademark Act defines other manners in which a mark may be deemed "abandoned," but we do not discuss them because we resolve this case on the basis of this form of abandonment.

of little help." *Sterling Brewers, Inc. v. Schenley Indus., Inc.*, 441 F.2d 675, 169 USPQ 590, 593 (CCPA 1971).

As set forth in Section 45 of the statute, there are two elements to a nonuse abandonment claim: (i) nonuse of the mark (ii) with an intent not to resume use of the mark. We now analyze the testimony and evidence introduced by the parties to determine whether Respondent used the OLD SCHOOL trademark after acquiring it in Harold's Stores, Inc.'s ("Harold's") bankruptcy liquidation auction. If the testimony and evidence fails to show that Respondent used the mark, then we determine whether Respondent discontinued use of the mark with intent not to resume such use.

### B. Relevant Testimony and Evidence

Harold's originally registered the trademark OLD SCHOOL, in typed drawing form, at issue in these proceedings. In 2008, Respondent's predecessor-in-interest, GBG,[54] was formed to acquire the registrations and their associated goodwill, including the URLs <oldschoolclothingcompany.com> and <harolds.com>, a number of "finished goods" (i.e., finished products that bore the OLD SCHOOL mark), and various furniture and fixtures from Harold's as part of an asset liquidation related to

---

[54] Johnston Testimony Dep., p. 46 (83 TTABVUE 49).

Harold's bankruptcy.[55] GBG is a joint venture between Respondent and Gordon Brothers Brands, LLC.[56] Gordon Brothers Brands, LLC is an asset disposition firm.[57]

Keith Johnston is the owner, sole member, and Chief Executive Officer of Respondent.[58] He has been in the fashion industry for 42 years.[59] Through Respondent, Johnston owns between 50 to 100 different clothing brands.[60] Respondent does not manufacture any products, but rather contracts out its manufacturing to other entities; that is, Respondent has "multiple sourcing agencies and multiple licensees that are authorized to manufacture."[61] Respondent focuses on

---

[55] Johnston Testimony Dep., pp. 21, 23-24 (83 TTABVUE 24, 26-27); Johnston Discovery Dep., p. 75 (39 TTABVUE 80) and *id.* at 73 (39 TTABVUE 77) ("The principal asset that I acquired was the IP holdings. The secondary assets were some effects, fixtures, furniture. They had stores right here in Dallas that had really, really nice fixtures. I bought some."). *See also* Johnston Testimony Dep., pp. 18-19, 21, 23 (83 TTABVUE 21-22, 24, 26).

[56] Johnston Discovery Dep., pp. 74-75 (83 TTABVUE 79-80).

GBG "wound down" within 24 months of its founding. *Id.* at p. 75 (39 TTABVUE 80).

[57] Johnston Discovery Dep., p. 75 (39 TTABVUE 80); Johnston Testimony Dep., pp. 23-24 (83 TTABVUE 26-27) ("And so we partnered with - - with another firm that specializes in dispositions of fixture, furniture, equipment, and inventory.").

[58] Johnston Testimony Dep., p. 8 (83 TTABVUE 11); Johnston Discovery Dep., p. 9 (39 TTABVUE 13).

Keith Johnston has an executive MBA from Northwestern University, "generally regarded as one of the higher ranked" schools. Johnston Testimony Dep., pp. 43-44 (83 TTABVUE 46-47).

[59] Johnston Testimony Dep., p. 20 (83 TTABVUE 23). *Compare* Johnston Testimony Dep., p. 99 (83 TTABVUE 102) (Keith Johnston has been in the clothing industry for 22 years).

[60] Johnston Testimony Dep., p. 21 (83 TTABVUE 24); *id.* at p. 100 (83 TTABVUE 103).

[61] Johnston Discovery Dep., p. 11 (39 TTABVUE 16).

A specialty retailer offering its own branded product uses a "sourcing agent" to have its branded products manufactured and shipped to the retailer's sales floor. That is what Scott Kuhlman was doing for Harold's. Johnston Testimony Dep., pp. 26-27 (83 TTABVUE 29-30).

Kuhlman described "sourcing" as "the design, manufacturing of mostly textiles and apparel." Kuhlman Testimony Dep. (September 14, 2020), p. 10 (44 TTABVUE 11); *id.* at p. 79

identifying and acquiring brands from others, such as apparel manufacturers, retail chains, catalog retailers, and, as here, the estates of bankrupt retailers.[62] The idea is to repurpose a brand to increase its value.[63] For example, Johnston saw Harold's OLD SCHOOL trademark "as valuable, underleveraged. And the ability to - - to improve them, improve their distribution, increase sales, would be a business opportunity to create value in terms of dollars."[64]

After Respondent, through GBG, acquired the OLD SCHOOL trademark,[65] Scott Kuhlman reached out to Johnston and explained that the Harold's bankruptcy estate owed him a large sum of money for clothing products Kuhlman had in process.[66] Kuhlman has been in the apparel field for approximately 44 years.[67] His background is in "apparel sourcing, design, production,"[68] with "better merchandise, better sourcing" exemplifying quality.[69] Kuhlman considers himself an expert in the field;[70]

---

(44 TTABVUE 80) ("So sourcing is the design, development of apparel and textiles."). *See also* Kuhlman Testimony Dep. (August 16, 2021), pp. 14-17 (82 TTABVUE 17-20).

[62] Johnston Discovery Dep., p. 60 (39 TTABVUE 65).

[63] Johnston Discovery Dep., p. 67 (39 TTABVUE 72).

[64] Johnston Testimony Dep., p. 22 (83 TTABVUE 25).

[65] Assignment executed on February 6, 2017; recorded at Reel/Frame 5984/0277.

[66] Johnston Discovery Dep., p. 39 (39 TTABVUE 44); Johnston Testimony Dep., pp. 19, 26, 28 (83 TTABVUE 22, 29, 31); Kuhlman Testimony Dep. (September 14, 2020), pp. 116-119 (44 TTABVUE 117-120); Kuhlman Testimony Dep. (August 16, 2021), p. 7 (82 TTABVUE 10).

[67] Kuhlman Testimony Dep. (September 14, 2020), p. 9 (44 TTABVUE 10); *id.* at p. 78 (44 TTABVUE 79); *id.* at p. 183 (44 TTABVUE 184); Kuhlman Testimony Dep. (August 16, 2021), p. 13 (82 TTABVUE 16) (over 30 years in the field).

[68] Kuhlman Testimony Dep. (August 16, 2021), p. 5 (82 TTABVUE 8).

[69] Kuhlman Testimony Dep. (August 16, 2021), p. 10 (82 TTABVUE 13).

[70] Kuhlman Testimony Dep. (August 16, 2021), p. 13 (82 TTABVUE 16).

he is fairly well-known for sourcing,[71] and for "having a very wide knowledge base."[72] He has managed six brands of his own and "probably 50 to 60 other brands" for others.[73]

Kuhlman, through his various companies (hereinafter Kuhlman), had an agreement with Harold's to "source, manufacture [apparel] and not sell their goods to - - you know, use their brand or label in any other way."[74] Kuhlman asked Johnston if he could sell his inventory of OLD SCHOOL clothing to recoup his costs. Johnston gave Kuhlman permission to sell those goods and to continue to "source" OLD SCHOOL clothing going forward,[75] so as to keep the OLD SCHOOL trademark in use and maintain its value.[76] Johnston testified that

> [t]he monetary component was to curtail the diminished value of the brand by eliminating the possibility that there would be a lapse in use or anything else that might diminish the value of the brand. One example would be to take it out of the market completely.
>
> So I looked at a bigger picture. Rather than nickels and dimes, I looked at what is the value of the brand and how

---

[71] Kuhlman Testimony Dep. (August 16, 2021), p. 17 (82 TTABVUE 20).

[72] Kuhlman Testimony Dep. (August 16, 2021), p. 16 (82 TTABVUE 19).

[73] Kuhlman Testimony Dep. (August 16, 2021), p. 17 (82 TTABVUE 20).

[74] Kuhlman Testimony Dep. (September 14, 2020), p. 88 (44 TTABVUE 89). "Again, I don't know the exact parameters of it, but it would be when you're sourcing your - - manufacturing, designing, they - - obviously their standards meet and you're working directly with them and they oversee it." *Id. See also id.* at p. 97 (44 TTABVUE 98) ("It's typical when you own a brand and you're using third parties, you ask them not to sell their goods to anyone else."); *id.* at p. 112 (44 TTABVUE 113) (Kuhlman was not allowed to sell or transfer any OLD SCHOOL clothing without Harold's approval).

[75] Johnston Discovery Dep., p. 39 (39 TTABVUE 44). *See also* Kuhlman Testimony Dep. (September 14, 2020), p. 123 (44 TTABVUE 124) ("[W]e agreed that we could sell them off through my retail channels and so forth.").

[76] Johnston Discovery Dep., pp. 39-40 (39 TTABVUE 44-45).

> do I retain the value of the brand. This is an asset that I just paid out a lot of money for, and see in my role as the caretaker and owner and in the interest of protecting my substantial investment, I deemed it best to allow that relationship to proceed.[77]

Kuhlman was interested in continuing OLD SCHOOL clothing because he thought it was a "cool, ongoing brand" that he could use in his retail and online stores.[78] He testified that he had invested years in the OLD SCHOOL trademark and wanted to continue it.[79] The agreement between Respondent and Kuhlman is "in place until we decided that [Respondent] wanted to do something else with the brand, [Respondent] could find something larger or sold the brand."[80] Kuhlman testified that

> [t]he agreement was that [Johnston] may do something with it in the future. He had - - again, he had just bought it. Just taken over it, and I - - he does a lot of things with brands, I believe. So another event could happen that would then terminate our agreement.[81]
>
> ⸻
>
> If [Respondent] gives the brand to somebody else, then - - then my agreement's [sic] done.[82]

---

[77] Johnston Discovery Dep., pp. 39-40 (39 TTABVUE 44-45).

[78] Kuhlman Testimony Dep. (September 14, 2020), p. 120 (44 TTABVUE 121); Kuhlman Testimony Dep. (August 16, 2021), p. 7 (82 TTABVUE 10) ("[T]here's an opportunity to sell Old School in the marketplace, which we agreed to and I continued to do."); Kuhlman Testimony Dep. (August 16, 2021), p. 22 (82 TTABVUE 25) (OLD SCHOOL is a fantastic trademark with an existing customer base); Kuhlman Testimony Dep. (August 16, 2021), p. 25 (82 TTABVUE 28).

[79] Kuhlman Testimony Dep. (September 14, 2020), p. 125 (44 TTABVUE 126).

[80] Kuhlman Testimony Dep. (September 14, 2020), p. 142 (44 TTABVUE 143).

[81] Kuhlman Testimony Dep. (September 14, 2020), pp. 142-143 (44 TTABVUE 143-144).

[82] Kuhlman Testimony Dep. (September 14, 2020), p. 143 (44 TTABVUE 144).

Respondent and Kuhlman continued their relationship, although the record is not clear as to whether it was through licensing, sourcing, or both (assuming a company can simultaneously source a branded product and license the same brand). For example,

● At his discovery deposition, Johnston testified that Respondent "licensed" the OLD SCHOOL trademark to "an affiliate of Kuhlman Company."[83]

● Kuhlman testified that he and Respondent had a "verbal license" regarding Kuhlman's use of the OLD SCHOOL trademark for clothing.[84]

● Kuhlman also testified that he did not license the use of the OLD SCHOOL trademark from Respondent because he does not license brands, he invents brands, and that he has never signed a license agreement and has never sought one out because "[t]hat's not my business."[85]

---

[83] Johnston Discovery Dep., p. 17 (39 TTABVUE 22). Subsequently, Johnston testified that Respondent "authorizes" Kuhlman to manufacture clothing under the OLD SCHOOL mark. *Id.* at p. 18 (39 TTABVUE 23); *id.* at p. 20 (39 TTABVUE 24) (Kuhlman is an authorized agent based on his agreement with Harold's); *id.* at p. 69 (39 TTABVUE 74) (Kuhlman is "not licensing goods, he's selling goods."). *See also* Johnston Testimony Dep., pp. 9-10 (83 TTABVUE 12-13) (Respondent licenses the OLD SCHOOL trademark to Scott Kuhlman).

Kuhlman testified that Respondent licensed him to use the OLD SCHOOL trademark. Kuhlman Testimony Dep. (August 16, 2021), pp. 11-12 (82 TTABVUE 14-15).

[84] Kuhlman Testimony Dep. (September 14, 2020), pp. 180-186 (44 TTABVUE 181-187). Kuhlman further testified that it was not unusual for him to make an oral agreement but he did not know whether oral agreements were standard in the apparel industry. Kuhlman Testimony Dep. (August 16, 2021), p. 12 (82 TTABVUE 15). According to Kuhlman, because his companies are not "technical companies" and because he typically deals in hundreds of units at a time, it is not cost effective to do business through a complicated contract. Kuhlman Testimony Dep. (August 16, 2021), p. 18 (82 TTABVUE 21).

[85] Kuhlman Testimony Dep. (August 16, 2021), pp. 88-89 (82 TTABVUE 91-92).

● Kuhlman testified that he agreed primarily to continue "sourcing" the OLD SCHOOL trademark clothing on behalf of Respondent and sold the goods only "if we could."[86]

● Respondent and Kuhlman kept the sourcing agreement Kuhlman had with Harold's in force.[87] Johnston testified as follows:

> Q. So would it be fair to say that [the] Kuhlman relationship carried forth from the Harold's Stores agreement into the relationship with [Respondent]?
>
> A. That's precisely correct.
>
> Q. Has that relationship been continuous since [Respondent] acquired the trademarks?
>
> A. Yes.[88]

Despite the lack of specificity regarding the precise nature of Kuhlman's relationship with Respondent, Kuhlman testified that his companies sold all the

---

[86] Kuhlman Testimony Dep. (September 14, 2020), pp. 130-136 (44 TTABVUE 131-137); *id.* at p. 137 (44 TTABVUE 138 ("I told [Keith Johnston] that our services include continually sourcing every product imaginable for apparel and sourcing.").

[87] Johnston Testimony Dep., p. 28-29 (83 TTABVUE 31-32). Kuhlman's sourcing agreement with Harold's included a manufacturing book and catalog covering quality and shipping. Kuhlman Testimony Dep., p. 89 (44 TTABVUE 90). "[I]t's everything from manufacturing standards to the way you ship things to how you ship them. It's a very lengthy document that most retailers have. It's very common." *Id.* at p. 90 (44 TTABVUE 91). *See also id.* at pp. 97-98 (44 TTABVUE 98-99) ("[T]here's a big booklet of requirements for shipping, invoicing, you know. Again, it's hundreds of pages long. Very typical. … But they had very little to do with – with – you know, didn't specify textile types and button types and zipper types and - - it was more on shipping and receiving, invoicing, those type of things."). Even Walmart and Target have similar documentation. *Id.* at p. 91 (44 TTABVUE 92).

[88] Johnston Discovery Dep., p. 21 (39 TTABVUE 26). *See also* Kuhlman Testimony Dep. (September 14, 2020), p. 100 (44 TTABVUE 101) ("And, again, with years and years and years of knowledge, that's why [Harold's] came to me and that's why they used me. So they knew that I would source and produce in the appropriate country using the appropriate products and textiles and cutting and selling and so forth.").

clothing products in the subject registrations between 2008 and the middle of 2018

and sold them through his retail outlets through 2016 in multiple states.[89]

Kuhlman testified that from some time prior to 2018 (he could not recall when,

and would not speculate) through 2018, he produced OLD SCHOOL clothing products

for Respondent through purchase orders.[90] In fact, Kuhlman testified that he

produced "hundreds, if not thousands, in total of everything you have listed" plus

socks, neckties and many other categories of apparel.[91] Nevertheless, Kuhlman

brought none of the purchase orders to his deposition to corroborate his testimony.[92]

Kuhlman testified that he sold all the OLD SCHOOL clothing products discussed

above at his own retail stores through 2018[93] and that he sold OLD SCHOOL clothing

from one of his websites "somewhere between 2008 and 2016."[94]

> Q.    [B]ased on the records we've reviewed, you have sold
>        Old School items - - Old School branded items, right?
>
> A.    Yes.[95]

---

[89] Kuhlman Testimony Dep. (August 16, 2021), p. 29 (82 TTABVUE 32); Kuhlman Testimony Dep. (September 14, 2020), pp. 41, 44-47, 53, 56-65, 68-70, 72-73 (44 TTABVUE 42, 45-48, 54, 57-66, 69-71, 73-74).

[90] Kuhlman Testimony Dep. (September 14, 2020), pp. 49-52 (44 TTABVUE 50-53).

[91] Kuhlman Testimony Dep. (September 14, 2020), p. 51 (44 TTABVUE 52).

[92] Kuhlman Testimony Dep. (September 14, 2020), pp. 51-52 (44 TTABVUE 52-53).

[93] Kuhlman Testimony Dep., (September 14, 2020), p. 63 (44 TTABVUE 64); *id.* at p. 155 (44 TTABVUE 156) (Kuhlman sold OLD SCHOOL products at retail).

[94] Kuhlman Testimony Dep. (September 14, 2020), p. 82 (44 TTABVUE 83).

[95] Kuhlman Testimony Dep. (August 16, 2021), p. 52 (82 TTABVUE 55).

Even though Kuhlman testified at trial that his company sold OLD SCHOOL clothing, in his discovery deposition, he testified that he did not know whether he had any sales documents that identified OLD SCHOOL clothing products:[96]

> Q. Would you suppose there's documentary evidence of these Old School goods being sold?

> A. Well, yeah. But documentary evidence is relative based on what do you think it is. Well, I can show you a sales report for A3 [one of Kuhlman's companies] that says we sold shirts, we sold pants, we sold jackets, but we sold other brands as well, so I don't know if we -- if we -- if we separated them by brand, and I don't think we did. That's why I'm saying I don't know. But I can put it out and look.[97]

Kuhlman also testified that he sold OLD SCHOOL products "online to other retailers."[98] He could only identify <kuhlmarket.com>, a domain name that he owned.[99] He testified that he has sales records from <kuhlmarket.com>, but he did not produce them and Respondent did not offer them in evidence.[100] After hearing Kuhlman's testimony, Petitioner's counsel searched <kuhlmarket.com> on the Internet Archive's Wayback Machine, and captured and printed screen shots from December 7, 2016, January 17, 2018, August 6, 2018, November 4, 2018 and August 15, 2019. "None of the captures depicted in those screen shots from the Wayback

---

[96] Kuhlman Testimony Dep. (August 16, 2021), pp. 64-66 (82 TTABVUE 67-69).

[97] Kuhlman Testimony Dep. (August 16, 2021), p. 66 (82 TTABVUE 69).

[98] Kuhlman Testimony Dep. (August 16, 2021), p. 56 (82 TTABVUE 59).

[99] Kuhlman Testimony Dep. (August 16, 2021), pp. 56-57 (82 TTABVUE 59-60).

[100] Kuhlman Testimony Dep. (August 16, 2021, p. 92 (82 TTABVUE 95). Kuhlman testified that he assumes he could the find the digital records. *Id.* at pp. 56-57 (82 TTABVUE 59-60).

Machine shows or mentions the OLD SCHOOL mark or goods being sold under the OLD SCHOOL mark."[101]

Kuhlman also testified at trial that he "may have" sold OLD SCHOOL clothing online to other retailers.[102] However, he was unable to identify the websites, testifying that "[i]t could've been several of them, potential sites, or to other ecommerce retailers."[103] Kuhlman has no records of sales of OLD SCHOOL products to retailers after 2016.[104]

By contrast, in his discovery deposition, Kuhlman testified that he sold OLD SCHOOL clothing exclusively through his stores and that he did not sell OLD SCHOOL clothing to other retailers.[105]

There are no written contracts, agreements, licenses, assignments, or other undertakings between Respondent and Scott Kuhlman regarding the use of the OLD SCHOOL trademark.[106] In addition, Kuhlman has no written plans regarding his companies' use of the OLD SCHOOL trademark.[107]

---

[101] Lay Rebuttal Testimony Decl. ¶ 3 and Exhibit I (84 TTABVUE 2-3 and 7-18).

[102] Kuhlman Testimony Dep. (August 16, 2021), p. 58 (82 TTABVUE 61).

[103] Kuhlman Testimony Dep. (August 16, 2021), p. 56 (82 TTABVUE 59).

[104] Kuhlman Testimony Dep. (August 16, 2021), pp. 58-59 (82 TTABVUE 61-62).

[105] Kuhlman Testimony Dep. (August 16, 2021), pp. 77-78 (82 TTABVUE 80-81).

[106] Kuhlman Testimony Dep. (September 14, 2020), pp. 25-26 (44 TTABVUE 26-27); *id.* at p. 138 (44 TTABVUE 139 ("The original verbal agreement was what we can do going forward, what we can make.").

[107] Kuhlman Testimony Dep. (September 14, 2020), p. 39 (44 TTABVUE 40).

Respondent, through Keith Johnston, monitors Kuhlman's sales of OLD SCHOOL products through "telephone discussions" with Kuhlman.[108] Respondent does not have any sales records, nor does Johnston make notes of his "discussions" with Kuhlman.[109] Nor does Kuhlman have any documents or copies of communications exchanged between him or any of his companies, and Keith Johnston or Respondent, regarding Kuhlman's sales of OLD SCHOOL clothing.[110] Even though Kuhlman testified that documents showing sales, dollar amounts, and unit sales of each OLD SCHOOL clothing product exist, he did not produce them at his testimony deposition and Respondent did not offer them in evidence.[111]

Johnston and Kuhlman discuss sales in the "aggregate," not sales of the individual different types of clothing.[112] Johnston testified that

> Yes, I told [Respondent] of the plans on what we were doing because [Respondent] knew what we were manufacturing and quantities and [Respondent] wanted to see the production. And so he knew the quantities all along.[113]

---

[108] Johnston Discovery Dep., p. 22 (39 TTABVUE 27); Johnston Testimony Dep., p. 98 (83 TTABVUE 101) (Respondent relies on conversations with Kuhlman to monitor sales of OLD SCHOOL clothing).

[109] Johnston Discovery Dep., p. 22 (39 TTABVUE 27); Johnston Testimony Dep., p. 97 (83 TTABVUE 100) (Respondent does not have any records of Kuhlman's sales of OLD SCHOOL clothing); *id.* at p. 98 (83 TTABVUE 101) (no record of telephone conferences with Kuhlman); *id.* at p. 40 (44 TTABVUE 41) (no sales slips, receipts, invoices, return receipts, alteration slips, shipping documents, or consumer complaints referring to OLD SCHOOL clothing).

[110] Kuhlman Testimony Dep. (September 14, 2020), pp. 30, 33 (44 TTABVUE 31, 34).

[111] Kuhlman Testimony Dep. (September 14, 2020), pp. 34-35 (44 TTABVUE 35-36).

[112] Johnston Discovery Dep., p. 23 (39 TTABVUE 28).

[113] Kuhlman Testimony Dep. (September 14, 2020), p. 163 (44 TTABVUE 164).

Nevertheless, Johnston has not seen any records of the amount of OLD SCHOOL clothing products Kuhlman has "sourced."[114] Thus, Respondent does not know how much OLD SCHOOL clothing Kuhlman has sold.[115]

In this regard, Kuhlman testified at trial that there may be invoices relating to the goods sold under the OLD SCHOOL trademark because he recalls seeing them, but he did not bring any to his September 14, 2020 testimony deposition and Respondent did not offer them in evidence.[116] However, at his discovery deposition, he testified that there were no documents between Kuhlman and Johnston relating to or concerning goods sold.[117] Subsequently, in his August 16, 2021 testimony deposition, Kuhlman testified about the following documents purportedly showing sales of goods under the OLD SCHOOL trademark:

● Exhibit 2 – a selling report from his "stores' group" listing the store, customer name, item purchased, price and quantity "from probably a file that we found someplace."[118] The report includes many different products, including OLD SCHOOL products. However, the report is undated and the products are not identified in a manner that we can determine what the products are (e.g., "Old School- 46 Red French,"[119] "Old School – F07-K21- 428 BLU STRP,"[120] "Old School – F07-K15- 3 PUR

---

[114] Johnston Discovery Dep., p 50 (39 TTABVUE 55). In addition to sales invoices, because Kuhlman "sources" the clothing from Italy, China, and Vietnam, "there would be customs duties records, things like that." *Id.* at pp. 50-51 (39 TTABVUE 55-56).

[115] Johnston Testimony Dep., pp. 96-97 (83 TTABVUE 99-100).

[116] Kuhlman Testimony Dep. (September 14, 2020), pp. 26-27 (44 TTABVUE 27-28).

[117] Kuhlman Testimony Dep. (September 14, 2020), p. 27 (44 TTABVUE 28).

[118] Kuhlman Testimony Dep. (August 16, 2021), pp. 30-31 (82 TTABVUE 33-34 and 111-123). The product is identified by a code. *Id.* at p. 31 (82 TTABVUE 34).

[119] 82 TTABVUE 111. According to Kuhlman, "Old School- 46 Red French" is "probably a woven shirt with french [sic] cuff." Kuhlman Testimony Dep. (August 16, 2021), p. 32 (82 TTABVUE 35).

[120] 82 TTABVUE 111.

BCUF"[121]). The only thing that Kuhlman knew about the source of the report is that it must have come from one of his companies because he had access to it and that it came from "a file of some kind."[122] At this point, Kuhlman conceded that he did not have a standard practice for maintaining his business records.[123] Finally, Kuhlman testified that he did not generate the document.[124]

● Exhibit 3 – an "Inventory Stock on Hand and Weeks Supply" report.[125] Again, the report is undated and Kuhlman could not recall the year this report was created.[126]

● Exhibit 4 – an inventory report dated October 29, 2013.[127] Kuhlman testified that as of October 29, 2013, the report shows that there were 12 OLD SCHOOL items he could not identify.[128]

● Exhibit 8 – a 2011 invoice for pants or trousers.[129] Kuhlman testified that the pants or trousers are "most likely" OLD SCHOOL.[130]

● Exhibit 12 – a March 24, 2012 invoice to A3 (a Kuhlman company) from Ray Best Store Srl for 150 OLD SCHOOL shirts.[131]

● Exhibit 13 – a two-page document consisting of an undated spreadsheet showing inventory invoiced, on order, on hand, and future orders and a spreadsheet listing various brands, including OLD SCHOOL, from 2008-2015.[132] Kuhlman testified that he was "assuming" the report is "probably a combination" of A3, LLC and SK2, his sourcing companies.[133] The second page of the spreadsheet lists the amounts he

---

[121] 82 TTABVUE 112.

[122] Kuhlman Testimony Dep. (August 16, 2021), p. 65 (82 TTABVUE 68).

[123] Kuhlman Testimony Dep. (August 16, 2021), pp. 68-69 (82 TTABVUE 71-72).

[124] Kuhlman Testimony Dep. (August 16, 2021), p. 73 (82 TTABVUE 76).

[125] Kuhlman Testimony Dep. (August 16, 2021), p. 33 (82 TTABVUE 36 and 124-129).

[126] Kuhlman Testimony Dep. (August 16, 2021), p. 35 (82 TTABVUE 38).

[127] Kuhlman Testimony Dep. (August 16, 2021), p. 35 (82 TTABVUE 38 and 130-140).

[128] Kuhlman Testimony Dep. (August 16, 2021), p. 36 (82 TTABVUE 39 and 140)

[129] Kuhlman Testimony Dep. (August 16, 2021), pp. 40-41 (82 TTABVUE 46-47 and 141).

[130] Kuhlman Testimony Dep. (August 16, 2021), p. 72 (82 TTABVUE 75). Scott Kuhlman did not generate this document. *Id.* at p. 73 (82 TTABVUE 76).

[131] Kuhlman Testimony Dep. (August 16, 2021), pp. 43-44 (82 TTABVUE 46-47 and 142).

[132] Kuhlman Testimony Dep. (August 16, 2021), pp. 44-48 (82 TTABVUE 47-51 and 143-144).

[133] Kuhlman Testimony Dep. (August 16, 2021), pp. 44-45 (82 TTABVUE 47-48).

invoiced the brand in a particular year.[134] Because the amounts in the columns for 2015 and 2014 for all the brands are the same, Kuhlman testified that the report needs correction.[135] Because the two spreadsheets have different formats and provide different information, they appear to be two different reports. Kuhlman testified that he did not create the documents but that they came off one of his computers.[136]

● Exhibit 14 – "Shipments and Open Orders with Factor info," dated June 7, 2015 to October 2, 2015.[137] "So Factor meaning we used an outside - - outside resource that we sold invoices to."[138] The report identifies invoices for OLD SCHOOL knits,[139] outerwear,[140] shirts,[141] sweaters,[142] and tailored clothing.[143] Kuhlman testified that he did not create the document and that he did not know from which system it came.[144]

Despite the dearth of documentation, Kuhlman testified that he tracked the sales of OLD SCHOOL clothing as follows:

> Q.    So did you track the - - these - - I guess the - - you personally, did you track how Old School goods were selling in - - in unit amounts? Did you follow - -
>
> A.    Yeah, we know what we make. We know what we sell.[145]

---

[134] Kuhlman Testimony Dep. (August 16, 2021), p. 47 (82 TTABVUE 50).

[135] Kuhlman Testimony Dep. (August 16, 2021), p. 48 (82 TTABVUE 51). The amount invoiced for OLD SCHOOL in the columns for 2013, 2014 and 2015 are the same. 82 TTABVUE 144.

[136] Kuhlman Testimony Dep. (August 16, 2021), p. 74 (82 TTABVUE 77).

[137] Kuhlman Testimony Dep. (August 16, 2021), pp. 48-51 (82 TTABVUE 51-55 and 145-149).

[138] Kuhlman Testimony Dep. (August 16, 2021), p. 49 (82 TTABVUE 52). "So a factored is a - - someone who buys your invoices at a discount but they pay you immediately." *Id.*

[139] 82 TTABVUE 145.

[140] 82 TTABVUE 145. Kuhlman testified that "outerwear" is a jacket. Kuhlman Testimony Dep., p. 50 (82 TTABVUE 53).

[141] 82 TTABVUE 146.

[142] 82 TTABVUE 146.

[143] 82 TTABVUE 147.

[144] Kuhlman Testimony Dep. (August 16, 2021), p. 75 (82 TTABVUE 78).

[145] Kuhlman Testimony Dep. (September 14, 2020), p. 165 (44 TTABVUE 166).

———

Q.   Over all estimate, how much - - overall all of your stores, what was the total estimated dollar value of goods sold under the Old School market, if you know?

A.   This would be an estimation, but percentage-wise it was under 20 percent. Dollar-wise over that time it was, you know, hundreds of thousands of dollars. Again, I couldn't give you an exact number.

Q.   Okay. Was it substantial[ly] worth the effort?

A.   Yes.[146]

Subsequently, Kuhlman clarified his testimony explaining that his overall sales of OLD SCHOOL clothing "probably was above a million."[147]

Respondent's revenues or income are not dependent on Kuhlman's sales of OLD SCHOOL products[148] because Kuhlman does not have any sales requirements (i.e., minimum required sales).[149] Respondent would have to contact "the principals of Kuhlman" to determine how many of each clothing product has been sold,[150] and, based on the record before us, Respondent has not done so. Thus, Respondent does not have first-hand knowledge whether its OLD SCHOOL clothing products are still

---

[146] Kuhlman Testimony Dep. (August 16, 2021), p. 13 (82 TTABVUE 16).

[147] Kuhlman Testimony Dep. (August 16, 2021), p. 29 (82 TTABVUE 32).

[148] Johnston Discovery Dep., pp. 23 and 38 (39 TTABVUE 28 and 43).

[149] Johnston Discovery Dep. p. 37 (39 TTABVUE 42); Johnston Testimony Dep., p. 94 (83 TTABVUE 97) (Kuhlman does not have minimum sales or financial reporting requirements and Respondent does not receive any money from Kuhlman); Respondent's response to Petitioner's interrogatory No. 9 (41 TTABVUE 34) ("This was a verbal agreement with no requirements for financial reporting or product reviews."); Kuhlman Testimony Dep. (September 14, 2020), p. 130 (44 TTABVUE 131) (Kuhlman was not required to pay Respondent); Kuhlman Testimony Dep. (September 14, 2020), pp. 160-161 (44 TTABVUE 161-162) (no minimum number of sales required).

[150] Johnston Discovery Dep., p. 33 (39 TTABVUE 38).

sold in retail outlets.[151] Johnston only "presumes" there are continuing sales based on what he hears from Kuhlman.[152]

When Kuhlman makes a new style of a product, he is required to send a sample to Respondent for review.[153] Kuhlman testified that OLD SCHOOL clothing is a classic brand characterized by continuity, so there are not many style changes or supplier changes.[154] Between 2008 and 2018, Kuhlman sent production samples of the above-identified OLD SCHOOL clothing to Respondent for inspection.[155] Johnston testified that there has not been any period of time exceeding three years where Kuhlman has not sent Respondent samples of each style of clothing,[156] but Respondent does not keep records of the samples.[157] In other words, there is no register or log of the samples.[158] Nor does Respondent have a checklist or any written

---

[151] Johnston Discovery Dep., p. 38 (39 TTABVUE 43).

[152] Johnston Discovery Dep., p. 38 (39 TTABVUE 43); Johnston Testimony Dep., p. 97 (83 TTABVUE 100).

[153] Johnston Discovery Dep., pp. 23-24 (39 TTABVUE 28-29). *See also* Johnston Testimony Dep., pp. 10-11 (83 TTABVUE 13-14) (Respondent has the right to inspect and control the OLD SCHOOL clothing sold by Kuhlman); *id.* at p. 33 (83 TTABVUE 36); Kuhlman Testimony Dep., p. 153 (44 TTABVUE 154) ("If we changed anything, we were required to send those to [Respondent]. … We were required to send [Respondent] production so that [Respondent] could either have it for himself or to make sure that were, you know, not doing any funny business with where we were doing stuff."); Kuhlman Testimony Dep. (August 16, 2021), p. 26 (82 TTABVUE 29).

[154] Kuhlman Testimony Dep. (August 16, 2021), p. 28 (82 TTABVUE 31).

[155] Kuhlman Testimony Dep. (September 14, 2020), pp. 156-158 (44 TTABVUE 157-159).

[156] Johnston Discovery Dep., pp. 25-31 (39 TTABVUE 30-36).

[157] Johnston Discovery Dep., p. 31 (39 TTABVUE 36).

[158] Johnston Discovery Dep., p. 38 (39 TTABVUE 43); Johnston Testimony Dep., p. 98 (83 TTABVUE 101); Kuhlman Testimony Dep. (September 14, 2020), p. 159 (44 TTABVUE 160) (no log).

document to use in evaluating the samples.[159] Respondent and Kuhlman would discuss the quality of the samples on the telephone:[160]

> No. I might, you know, feel the fabric, look at the quality of the cut, the sew, the finished good. It wasn't a checklist. It was just kind of look at it, examine it.[161]

Respondent does not advertise any goods or services under the OLD SCHOOL trademark, but Kuhlman advertises products under the OLD SCHOOL trademark to potential retail buyers.[162] Kuhlman testified at trial that he advertised OLD SCHOOL clothing through e-blasts and social media.[163]

Respondent, through Keith Johnston, has a vague, general plan of what Respondent wants to do with the OLD SCHOOL trademark:

> My plan is to reintroduce the Old School brand and, you know, just take it out and either do it digital native or take it to one of the off-price retailers that I know so well and do a license with Walmart or somebody like that, where I give them exclusive and they're Old School. They do deals like that all the time.[164]

---

[159] Johnston Discovery Dep., p. 118 (39 TTABVUE 123).

[160] Johnston Testimony Dep., p. 34 (83 TTABVUE 37); Kuhlman Testimony Dep. (August 16, 2021), p. 28 (82 TTABVUE 31).

[161] Johnston Discovery Dep., p. 118 (39 TTABVUE 123).

[162] Johnston Discovery Dep., p. 102 (39 TTABVUE 107).

[163] Kuhlman Testimony Dep. (September 14, 2020), pp. 169-171 (44 TTABVUE 170-172). In his discovery deposition, however, he testified that he never did any advertising for OLD SCHOOL clothing. Kuhlman Testimony Dep. (September 14, 2020), p. 170 (44 TTABVUE 171).

[164] Johnston Discovery Dep., p. 92 (40 TTABVUE 94). Respondent improperly designated this testimony as confidential. As indicated above, Respondent's plan is so vague and general that it does not constitute a trade secret or commercially sensitive information. The purported plan is no different than what any other entrepreneur intends (i.e., license or sell its branded product to a national retailer). *See* Kuhlman Testimony Dep. (September 14, 2020), p. 120 (44 TTABVUE 121) ("And so the idea of taking [the OLD SCHOOL brand] to a bigger level was always the goal, obviously, including on our side.").

The purported plan is not written down; it is in Johnston's head.[165]

Respondent's process for finding licensees is based on Johnston's knowledge of the apparel industry and the people involved in the apparel industry:[166]

> Q    Can you describe [Respondent's] process for finding licensees to work with?
>
> A.    If you're in the business you generally know who's out there, who are potential licensees. Everybody's kind of linked and connected in the fashion and apparel manufacturing business. So the process would be who do you know, who that [sic] you know, what are their capabilities, references, asking who's sourcing what for you, things like that.[167]

Respondent has not had any specific conversations about OLD SCHOOL clothing products with any of the other licensees or buyers with whom Respondent does business:[168]

> Q.    And has [sic] any of those buyers ever come into the showroom and inquired about Old School goods?
>
> A.    I'm sure we've had conversations, yeah, but nobody came [sic] specific -- everybody -- you know, most of the executives are licensees that I would be dealing with. They know the extent of the portfolio that [Respondent] owns. And so, you know, we'll discuss lots of different things and Old School would be one

---

[165] Johnston Discovery Dep., p. 93 (40 TTABVUE 95) (improperly designated confidential). *See also* Johnston Testimony Dep., pp. 70-72 (83 TTABVUE 73-75) ("I've got scraps and notes and - - and, in my mind, I - - I know what - - what that go-to-market plan is.").

[166] Johnston Discovery Dep., p. 108 39 TTABVUE 113).

[167] Johnston Discovery Dep., p. 108 (39 TTABVUE 113). *See also* Johnston Discovery Dep., p. 92 (40 TTABVUE 94) (improperly designated confidential) ("Well, I mean, that's my business, it's what I do every day, and I'll discuss it at sort of a high level to see if there's interest and then, you know, follow up. When did I start doing that? I started doing that the week after we bought it.").

[168] Johnston Discovery Dep., pp. 55-56 (39 TTABVUE 60-61).

          that's come up in multiple discussions, I would imagine.[169]

———

Q.    And you mentioned that you've talked to several people. Can you recall some of the people you've talked to about furtherance of that plan?

A.    I would say those are trade secrets. I can tell you generally speaking they're off-price or, you know, the Walmarts, Targets of the world or off-price TJXs, Ross stores, the guys like that, people that can move a lot of - -[170]

———

Q.    And that you actively tried to license the mark.

A.    Yeah.

Q.    What does that mean? "Actively tried"?

A.    That means you get on the phone with the -- with whomever's in charge of licensing brands for the -- for the major international retailer. And -- and most of, you know -- many major national retailers have a -- have a mix, a combination of owned brands and licensed brands.

    And so if I'm trying to do an exclusive license with -- with, you know, Walmart or Target, there are people that are, you know -- people within the -- the -- that

---

[169] Johnston Discovery Dep., pp. 55-56 (39 TTABVUE 60-61).

[170] Johnston Discovery Dep., p. 94 (40 TTABVUE 96) (improperly designated confidential). *See also* Johnston Testimony Dep., p. 14 (83 TTABVUE 17) (Johnston has offered to license the OLD SCHOOL trademark to the Vice President of the TJX Companies, owner of T.J. Maxx and Marshalls "probably between five and ten times as just a normal course of business."). *See also* Johnston Testimony Dep., pp. 40-41 (83 TTABVUE 43-44).

In addition, Johnston has offered the OLD SCHOOL trademark to Symphony Brands, a licensing agent, in the normal course of business over the last four years (since 2017). Johnston Testimony Dep., p. 16 (83 TTABVUE 19). *See also* Johnston Testimony Dep., pp. 41-42 (83 TTABVUE 44-45).

organization that that's specifically what they're tasked to do.

And so when I call them, and I say, "Hey. We own the Old School trademark. Would you like to license it -- "

Q.    You just pick up the phone and call them?

A.    Sure. I mean, that's how business gets done.

Q.    Okay.

A.    I mean, generally, we'll have, you know, a presentation to go along with it. And, you know, you know, sort of style range of -- of what -- what the goods will be.

And but that's how it's done. We pick -- you pick up, you know -- you set up a meeting, you talk about it, you pick up the phone, and call them, you -- you know, sell it.[171]

These purported conversations have taken place in "the last 6 to 18 months" (i.e., August 2016 through August 2017).[172]

Respondent does not have written documents identifying Johnston's communications with others in furtherance of his above-noted plans for the OLD SCHOOL trademark.[173]

On the other hand, Respondent has displayed the OLD SCHOOL trademark on Respondent's website <brandedinc.com> since Respondent acquired the mark in

---

[171] Johnston Testimony Dep., pp. 38-40 (83 TTABVUE 41-43). However, in his discovery deposition, Keith Johnston testified that he does not need a plan because he can just get on the telephone and talk to whomever he needs to speak. Johnston Discovery Dep., pp. 92-93 (40 TTABVUE 94-95) (improperly designated confidential).

[172] Johnston Discovery Dep., pp. 94-95 (40 TTABVUE 96-97) (improperly designated confidential).

[173] Johnston Discovery Dep., p. 93 (40 TTABVUE 95) (improperly designated confidential).

2008.[174] Exhibit 2 to Johnston's testimony deposition is Respondent's home page. It displays 44 of Respondent's brands. Johnston testified that when you click on the OLD SCHOOL logo, it directs you to the OLD SCHOOL web page.[175] We reproduce below the OLD SCHOOL webpage accessible in this manner on the <brandedinc.com> website:



---

[174] Johnston Testimony Dep., pp. 16-17 (83 TTABVUE 19-20).

[175] Johnston Testimony Dep., pp. 50-54 and Exhibit 3 (83 TTABVUE 53 and 188). At the bottom of the webpage, Respondent lists the International Classes covering its registered products.

Consumers cannot purchase OLD SCHOOL clothing from the <brandedinc.com> website; it is an informational website for the apparel industry, not the consumer.[176] In that regard, Johnston testified as follows:

> I'll explain this to you again. This is a site that is aimed to corporate customers that would be interested in licensing. This is not a site to market to individual customers. Savvy on that?[177]
>
> ⸻
>
> I'm marketing directly to a corporate entity, so that they can then license the brand or buy, you know, finished goods. So you got that?[178]

Johnston testified that Respondent sells OLD SCHOOL clothing through third-party websites.[179] For example, Johnston testified at trial that Respondent's customers sell OLD SCHOOL clothing in the secondary market through <poshmark.com>.[180] Respondent does not know what customers are selling OLD SCHOOL clothing in the secondary market through <poshmark.com> and it does not have any documentary evidence regarding these sales.[181] Respondent does not know who fills the orders for OLD SCHOOL clothing sold in the secondary market through <poshmark.com>.[182]

---

[176] Johnston Testimony Dep., pp. 49-50 and Exhibit 2 (83 TTABVUE 52 and 184-187).

[177] Johnston Testimony Dep., p. 51 (83 TTABVUE 54).

[178] Johnston Testimony Dep. p. 52 (83 TTABVUE 55).

[179] Johnston Testimony Dep., p. 65 (83 TTABVUE 68).

[180] Johnston Testimony Dep., pp. 65-66 (83 TTABVUE 68-69).

[181] Johnston Testimony Dep., pp. 65-66 (83 TTABVUE 68-69).

[182] Johnston Testimony Dep., pp. 66-67 (83 TTABVUE 69-70).

Having received a USPTO Office Action refusing to register Petitioner's OLD SKOOL trademark, Petitioner's counsel engaged Bishop IP Investigations Limited to find use, if any, of the trademark OLD SCHOOL by GBG, Respondent, or Scott Kuhlman. Inês Klinesmith, the investigator, found no uses of Old School in her two investigations (March 2017 and April 2018).[183]

> 5. Other than on Branded LLC's [Respondent's] website, we found no references anywhere to the subject marks being used in connection with clothing or physical stores within the five years preceding the completion of our investigation in March 2017.[184]
>
> ⸻
>
> 12. We conducted searches of press records covering the last thirty years and located no references to **Old School** in relation to Kuhlman or Hampshire Group.[185]
>
> 13. We found no relevant advertisements.
>
> 14. In summary, we found no evidence to suggest that Kuhlman Company or Hampshire Group has ever marketed or distributed the **Old School** brand.[186]

Finally, the investigator tried to contact Keith Johnston via LinkedIn, the telephone number posted on Respondent's website, and through Respondent's website. Each attempt was unsuccessful.[187]

---

[183] Klinesmith Testimony Decl. ¶¶ 3-4 and 8-9 (43 TTABVUE 2-3). Klinesmith conducted her initial investigation in March 2017 and a follow-up investigation in April 2018. *Id.*

[184] *Id.* at ¶ 5 (43 TTABVUE 3).

[185] The Hampshire Group purchased S. Kuhlman, LLC in "roughly 2010 or '11." Kuhlman Testimony Dep. (September 14, 2020), p. 17 (44 TTABVUE 18). In 2013, Kuhlman repurchased the company from the Hampshire Group. *Id.* at p. 18 (44 TTABVUE 19).

[186] Klinesmith Testimony Decl. ¶¶ 12-13 (43 TTABVUE 4).

[187] *Id.* at ¶ 3 (43 TTABVUE 3).

C. Analysis

### 1. Petitioner's prima facie case of abandonment.

As noted above, Petitioner, upon receiving a Trademark Act Section 2(d) likelihood of confusion refusal to register its mark based on Respondent's registrations for the mark OLD SCHOOL, engaged a private investigator to search for evidence of whether Respondent had used and was using the mark. The private investigator found no evidence of any use of the mark OLD SCHOOL by Respondent, GBG, or Scott Kuhlman.

Respondent criticizes the declaration of Inês Klinesmith, the investigator, for the following reasons:

● Petitioner used an investigator located in the United Kingdom because, according to Respondent, cross-examination of a foreign witness is difficult.[188]

However, Respondent did not indicate whether it asked Petitioner to produce Klinesmith in the United States or in the United Kingdom for cross-examination, whether Petitioner refused any such request, or whether Respondent ever intended to cross examine her. Accordingly, in the final analysis, Respondent did not cross-examine Klinesmith to explore the purported deficiencies in her declaration, discussed below, and we do not draw any inferences from Petitioner's selection of an investigator located in the United Kingdom.

---

[188] Respondent's Brief, p. 29 n.7 (89 TTABVUE 30).

● Klinesmith does not provide any details concerning her search of "international press records and advertising" (e.g., type of press records, databases used, the number of databases searched, the searches, whether U.S. records were searched, etc.).[189]

We agree and, therefore, do not rely on that portion of her declaration. However, we accept at face value her testimony that she could not find any evidence that Respondent or Kuhlman used the mark OLD SCHOOL.

● It is not clear whether Klinesmith searched <oldschoolclothing.com>, <brandedinc.com>, or some other website.[190]

We interpret Klinesmith's statement "[o]ther than on Branded LLC's website" to mean the website accessible at <brandedinc.com>. In this regard, we note that Johnston testified that prior to his February 22, 2018 discovery deposition, Respondent had not used the website <oldschoolclothing>.[191] This is after the March 2017 time frame that Klinesmith refers to in her declaration.

● There is no evidence that Johnston ever received the messages that Klinesmith purportedly left,[192] and Klinesmith failed to explain the nature or content of her messages or the telephone numbers or email addresses where she left the messages.[193]

---

[189] Respondent's Brief, pp. 27-28 (89 TTABVUE 28-29) (citing Klinesmith Testimony Decl. ¶ 6 (43 TTABVUE 3)).

[190] Respondent's Brief, p. 28 (89 TTABVUE 29).

[191] Johnston Testimony Dep., p. 54 (83 TTABVUE 57).

[192] Respondent's Brief, p. 28 (89 TTABVUE 29).

[193] Respondent's Brief, pp. 28-29 (89 TTABVUE 29-30).

However, in his testimony deposition, taken after Petitioner introduced the Klinesmith declaration, Keith Johnston did not testify about whether he checks LinkedIn, voicemail, or Respondent's website for messages, or that he did not receive any messages. Respondent, in its brief, did not argue that Johnston did not receive Klinesmith's messages; Respondent argued only that there is no evidence Johnston received any messages.[194] Because Klinesmith's reputation as a private investigator is based in part on her being thorough, and because Johnston did not testify regarding his regular practice for checking communications, we find that Klinesmith sent Johnston inquiries to which Johnston did not reply.

● Because the Klinesmith declaration was executed in the United Kingdom, it is not made under penalty of perjury and, therefore, it is an unverified statement.[195]

We disagree. The verification statement reads as follows:

> I, being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, declare under penalty of perjury under the laws of the United States of America that all statements made of my own knowledge are true and statements made on information or belief are believed to be true.[196]

Klinesmith declares that under 18 U.S.C. § 1001 and under penalty of perjury under the laws of the United States, her statements are true or believed to be true. Trademark Rule 2.123(a)(2), 37 C.F.R. § 2.123(a)(2), permits the taking of testimony "by affidavit or declaration," and Trademark Rule 2.123(a)(1), 37 C.F.R. § 2.123(a)(1),

---

[194] Respondent's Brief, pp. 28-29 (89 TTABVUE 29-30).

[195] Respondent's Brief, p. 28 (89 TTABVUE 20).

[196] 43 TTABVUE 4.

provides that such an affidavit or declaration must be made "pursuant to [Trademark Rule] 2.20," which allows use of "the language of 28 U.S.C. 1746." Section 1746 provides as follows:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: (1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the forgoing is true and correct. Executed on (date). (Signature)."

Klinesmith's declaration includes substantially the form of language specified in 28 U.S.C. § 1746, and Respondent has not cited any authority for discounting her verified statement because it was executed in the United Kingdom. *See M/S R.M. Dhariwal (HUF) 100% EOU v. Zarda King Ltd.*, 2019 USPQ2d 149090, at *3 (TTAB 2019) (to substantially comply with 28 U.S.C. § 1746, declaration executed outside the United States must allege execution under United States law or its substantial equivalent).

We find credible Klinesmith's testimony that she did not find any evidence of Respondent or Kuhlman using OLD SCHOOL to identify clothing.

After hearing Kuhlman's testimony, Petitioner's counsel searched <kuhlmarket.com> on the Internet Archive's Wayback Machine. Petitioner's counsel captured and printed screen shots from December 7, 2016, January 17, 2018, August 6, 2018, November 4, 2018 and August 15, 2019, and testified that "[n]one of the captures depicted in those screen shots from the Wayback Machine shows or mentions the OLD SCHOOL mark or goods being sold under the OLD SCHOOL mark."[197]

### 2.    Respondent's evidence of use.

Respondent failed to introduce any credible documents showing use of the mark OLD SCHOOL to identify clothing or sales of OLD SCHOOL clothing. There was no evidence of any advertising. The documents Kuhlman testified about in his August 16, 2021 testimony deposition regarding sales were undated or OLD SCHOOL clothing was not expressly identified. In addition, Kuhlman could not identify the source of the documents, none of which he generated.[198] Kuhlman conceded that he did not have a standard practice for maintaining his business records.[199] He was not even sure that his companies separated sales records by brand.[200]

Based on the foregoing, we find that Petitioner has shown that Respondent made no "bona fide use of [the OLD SCHOOL] mark in the ordinary course of trade," 15 U.S.C. § 1127, since it acquired the mark in the Harold's bankruptcy liquidation

---

[197] Lay Rebuttal Testimony Decl. ¶ 3 and Exhibit I (84 TTABVUE 2-3 and 7-18).

[198] Kuhlman Testimony Dep. (August 16, 2021), p. 73 (82 TTABVUE 76).

[199] Kuhlman Testimony Dep. (August 16, 2021), pp. 68-69 (82 TTABVUE 71-72).

[200] Kuhlman Testimony Dep. (August 16, 2021), p. 66 (82 TTABVUE 69).

in 2008, which, because it constitutes a period of time greater than "3 consecutive years," is "prima facie evidence of abandonment." *Id.* We now turn to whether Respondent has introduced evidence (contrary to Petitioner's prima facie showing) that it has either used the mark or that it has intended to resume use (e.g., "a convincing demonstration of 'excusable non-use' that would negate any intent not to resume use of the mark."). *Noble House Home Furnishings,* 118 USPQ2d at 1417 (citing *Imperial Tobacco*, 14 USPQ2d at 1393).

Without credible documentation, Respondent has chosen to rely on Kuhlman's testimony. As discussed above, Kuhlman testified that his companies sold OLD SCHOOL clothing products identified in the registrations at issue between 2008 or 2009 and the middle of 2018. However, this represents the testimony of a single witness, and this witness's testimony is both vague on critical points and riddled with inconsistencies. In short, it does not persuade us. *See Jim Dandy Co.*, 173 USPQ at 676 (rejecting proffered showing of use in commerce based on witness testimony that was "far from clear and definite"). *Cf. Bass Pro Trademarks, LLC v. Sportsman's Warehouse, Inc.*, 89 USPQ2d 1844, 1856 (TTAB 2008) (respondent's testimony regarding its first use was not clear and convincing but rather was vague and undocumented). Generally, to be credible, testimony cannot be characterized by inconsistencies, contradictions and uncertainties. *Cf. Powermatics, Inc. v. Globe Roofing Prods. Co.*, 341 F.2d 127, 144 USPQ 430, 432 (CCPA 1965); *Exec. Coach Builders, Inc. v. SPV Coach Co., Inc.*, 123 USPQ2d 1175, 1185 (TTAB 2017) ("Such testimony 'should not be characterized by contradictions, inconsistencies, and

indefiniteness but should carry with it conviction of its accuracy and applicability."")
(quoting *B.R. Baker Co. v. Lebow Bros.*, 150 F.2d 580, 66 USPQ 232, 236 (CCPA 1945)); *Nat'l Blank Book Co., Inc. v. Leather Crafted Prods., Inc.*, 218 USPQ 827, 828 (TTAB 1983); *GAF Corp. v. Anatox Analytical Servs., Inc.*, 192 USPQ 576, 577 (TTAB 1976) (oral testimony may establish prior use when the testimony is clear, consistent, convincing, and uncontradicted).

For the following reasons, we do not find Kuhlman's testimony clear, consistent, convincing and without inconsistencies and contradictions:

● His testimony regarding his relationship with Respondent was inconsistent. He testified he was a sourcing agent, not a licensee,[201] and he testified that he had an oral license with Respondent.[202] As someone who has been in the clothing industry for over 40 years, who considers himself an expert in the field, and has managed six brands of his own and 50 to 60 other brands for others, he would be expected to know the nature of any legitimate, extant agreement he has with Respondent regarding the use of the OLD SCHOOL trademark;

---

[201] Kuhlman Testimony Dep. (September 14, 2020), p. 88 (44 TTABVUE 89). "Again, I don't know the exact parameters of it, but it would be when you're sourcing your - - manufacturing, designing, they - - obviously their standards meet and you're working directly with them and they oversee it." *Id.*; *see also id.* at p. 97 (44 TTABVUE 98) ("It's typical when you own a brand and you're using third parties, you ask them not to sell their goods to anyone else."); *id.* at p. 112 (44 TTABVUE 113) (Kuhlman was not allowed to sell or transfer any OLD SCHOOL clothing without Harold's approval).

He testified that he did not license the use of the OLD SCHOOL trademark from Respondent because he does not license brands, he invents brands, and that he has never signed a license agreement and has never sought one out because "[t]hat's not my business." Kuhlman Testimony Dep. (August 16, 2021), pp. 88-89 (82 TTABVUE 91-92).

[202] Kuhlman Testimony Dep. (September 14, 2020), pp. 180-186 (44 TTABVUE 181-187).

● He testified both that there were terms to his agreement with Respondent[203] and that there were no terms to his agreement with Respondent;[204]

● His testimony regarding his companies' sales of the relevant OLD SCHOOL clothing products was general and without specificity. The reason for his lack of specificity is that he did not know whether he separated his business records by brand;[205] and

● In his discovery deposition, he testified that he sold OLD SCHOOL clothing exclusively through his stores and that he did not sell OLD SCHOOL clothing to other retailers,[206] but in his August 16, 2021 testimony deposition, he testified that he sold OLD SCHOOL products "online to other retailers."[207]

In addition, Keith Johnston testified that Respondent sells OLD SCHOOL clothing through third-party websites.[208] But those purported sales were by people selling OLD SCHOOL clothing in the secondary market through <poshmark.com>.[209] Respondent does not know who is selling OLD SCHOOL clothing in the secondary market through <poshmark.com> and it does not have any documentary evidence

---

[203] Kuhlman Testimony Dep. (September 14, 2020), pp. 136-139 and 141 (44 TTABVUE 137-140 and 142).

[204] Kuhlman Testimony Dep. (September 14, 2020), pp. 139-140 (44 TTABVUE 140-141).

[205] Kuhlman Testimony Dep. (August 16, 2021), p. 66 (82 TTABVUE 69).

[206] Kuhlman Testimony Dep. (August 16, 2021), pp. 77-78 (82 TTABVUE 80-81).

[207] Kuhlman Testimony Dep. (August 16, 2021), p. 56 (82 TTABVUE 59).

[208] Johnston Testimony Dep., p. 65 (83 TTABVUE 68).

[209] Johnston Testimony Dep., pp. 65-66 (83 TTABVUE 68-69).

regarding these sales.[210] Respondent does not know who fills the orders for OLD SCHOOL clothing sold in the secondary market through <poshmark.com>.[211]

In this regard, Kuhlman testified that he produced OLD SCHOOL clothing pursuant to a purchase order from one of Johnston's companies, Old School Clothing Co. or Respondent, for hundreds, if not thousands, of different clothing products. Although Kuhlman claimed that he has the purchase orders, he did not bring them to his first testimony deposition despite the subpoena duces tecum and Respondent did not offer them in evidence at his second testimony deposition, leaving his testimony entirely uncorroborated.[212]

Kuhlman claims that he has information and documentation about his use of the OLD SCHOOL trademark, but, rather than make such information and documents available, he has relied on a few unreliable documents and vague general testimony, leaving his testimony unclear at best, with Respondent providing nothing more than mere argument about how his uncorroborated testimony should be interpreted.

Because of the inconsistences, contradictions, and non-specific nature of Kuhlman's testimony regarding his companies' claimed sales of OLD SCHOOL clothing, without corroborating documents which he claims exist, we find Kuhlman's testimony was far from clear and consistent, and thus unpersuasive. Therefore, Respondent did not rebut by a preponderance of the evidence the presumption of

---

[210] Johnston Testimony Dep., pp. 65-66 (83 TTABVUE 68-69).

[211] Johnston Testimony Dep., pp. 66-67 (83 TTABVUE 69-70).

[212] Kuhlman Testimony Dep. (September 14, 2020), pp. 49-52 (44 TTABVUE 50-53).

abandonment of the OLD SCHOOL trademark resulting from Petitioner's proof that Respondent did not use the mark since Respondent's acquisition of the mark from Harold's in the bankruptcy liquidation auction, a period of more than three consecutive years, by proving use of the OLD SCHOOL mark.

Petitioner's prima facie case of abandonment eliminates its burden of establishing the intent element of abandonment as an initial part of its case and creates a rebuttable presumption that Respondent had no intent to commence or resume use of the OLD SCHOOL trademark. *See Rivard v. Linville*, 133 F.3d 1446, 45 USPQ2d 1374, 1376 (Fed. Cir. 1998); *Imperial Tobacco*, 14 USPQ2d at 1393. The presumption shifts the burden to Respondent to introduce evidence that it intended to commence or resume use of its OLD SCHOOL trademark during the period of non-use. *See Rivard v. Linvell, supra*; *Cerveceria India Inc. v. Cerveceria Centroamerica, S.A.*, 10 USPQ2d 1064, 1068 (TTAB 1989), *aff'd*, 892 F.2d 1021, 13 USPQ2d 1307 (Fed. Cir. 1989).

### 3. Respondent's intent to resume use.

In order to establish intent to commence or resume use, a respondent must put forth evidence with respect to either specific activities undertaken during the period of nonuse, or special circumstances which excuse nonuse. *See Cerveceria India*, 10 USPQ2d at 1069 (respondent failed to explain why its product was unavailable in the United States and, therefore, failed to provide credible evidence of intent to resume use). *See also On-Line Careline, Inc. v. Am. Online*, 229 F.3d 1080, 56 USPQ2d 1471 (Fed. Cir. 2000). The statutory provision that a mark is abandoned

when its use has been discontinued with intent not to resume is "appropriate for the usual situation in which a registered mark has been used at some time ... followed by a period of nonuse." *Imperial Tobacco*, 14 USPQ2d at 1394. The question is whether the registrant "discontinued" use with an "intent not to resume." *id.* at 1393. Here Respondent never intended to use the mark itself, but claims that it always intended to license it or sell it.

A bona fide license of a mark involves use of a mark by the licensee that inures to the benefit of the licensor. *See Moreno v. Pro Boxing Supplies, Inc.*, 124 USPQ2d 1028, 1035 (TTAB 2017) ("It is well-settled that use of a mark by a licensee inures to the benefit of the trademark owner."); *Quality Candy Shoppes/Buddy Squirrel of Wisc., Inc. v. Grande Foods*, 90 USPQ2d at 1392 ("A basic principle underpinning trademark law in the United States is use of a mark in commerce; and years of precedent make it very clear that proper use of a mark by a trademark owner's licensee or related company constitutes 'use' of that mark attributable to the trademark owner."). Thus, if Respondent had presented evidence of a bona fide plan to license the OLD SCHOOL trademark, Respondent might have been able to prove its intent to resume use of the mark.

However, Respondent cannot prove its intent to resume use of the mark on the basis of its intent to sell the mark, especially where the evidence that it "used" the mark at all is so vague, inconsistent and unreliable. An intent to sell a mark separate and apart from an ongoing business or existing goodwill does not establish the seller's intent to resume use because the seller is attempting to sell the mark alone and not

associated with a business, or relevant portion thereof, producing an actual product in commerce. In other words, holding a mark with no use, with only an intent to sell the mark at some time in the future, is not proof of present use or intent to resume use. Under these circumstances, the buyer, not the seller, would be the party resuming use and such use would not relate back to the seller and establish the seller's intent to resume use. Rather, any use commenced by the buyer of a mark not associated with a business or relevant portion thereof could, at best, establish only the buyer's going-forward priority rights based on its own, and proper, first use of the mark.

Indeed, an intent to sell a trademark separate and apart from any established goodwill in the mark is evidence of trafficking in trademarks. *See M.Z. Berger & Co., Inc. v. Swatch AG*, 787 F.3d 1368, 114 USPQ2d 1892, 1899 (Fed. Cir. 2015) (applicant's intent in filing the application was merely to reserve a right in the mark, and not a bona fide intent to use the mark in commerce); *Caesars World v. Milanian*, 247 F. Supp.2d 1171, 1192 (D. Nev. 2003) (reserving what the owner perceived to be desirable names with the intent to sell or license them to others).

The Trademark Act seeks to prevent trafficking in trademarks because the "[u]se of the mark by the assignee in connection with a different goodwill and different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another." *Marshak v. Green*, 746 F.2d 927, 223 USPQ 1099, 1100 (2d Cir. 1984). *Cf. Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 121 USPQ2d 1357, 1362 (6th Cir. 2017) (absence

of objective evidence of plans to use the mark on certain goods and services proved the lack of a bona fide intent to use) (quoting *M.Z. Berger*, 114 USPQ2d at 1898); and *Clorox Co. v. Chem. Bank*, 40 USPQ2d 1098, 1104 (TTAB 1996) ("[T]he remedy intended by Congress, in order to prevent the trafficking in marks which are the subject of intent-to-use applications, was that any such prohibited assignment, is not only invalid, … but the prohibited assignment also voids the application or any resulting registration.").

Even where, as here, any assignee might use the mark OLD SCHOOL on the same products identified in the registration, Respondent has not developed any goodwill in the mark for those or any other products. Therefore, we hold that an intent to sell a trademark separate and apart from an ongoing business supports finding an intent not to resume use (i.e., no intent to resume use) by the seller.

Keith Johnston testified that he is in the business of repurposing brands to increase their value.[213] He saw Harold's OLD SCHOOL trademark "as valuable, underleveraged. And … a business opportunity to create value terms of dollars."[214] His plan is to find a company to whom Respondent could license or sell the OLD SCHOOL trademark. This plan is not written down; it is in his head.[215] Although Respondent has not had any specific conversations about OLD SCHOOL clothing

---

[213] Johnston Discovery Dep., p. 67 (39 TTABVUE 72).

[214] Johnston Testimony Dep., p. 22 (83 TTABVUE 25).

[215] Johnston Discovery Dep., p. 93 (40 TTABVUE 95) (improperly designated confidential). *See also* Johnston Testimony Dep., pp. 70-72 (83 TTABVUE 73-75) ("I've got scraps and notes and - - and, in my mind, I - - I know what - - what that go-to-market plan is.").

products with any of the licensees or buyers with whom Respondent does business,[216] Johnston claims that he executes this plan by having conversations with companies he thinks would be interested in licensing or buying the OLD SCHOOL trademark.[217] There are no written documents memorializing any such communications with others in furtherance of his purported plan.[218] Johnston does not use a pitch book unless the licensee or buyer requests it.[219] However, as reproduced above, Respondent displays the OLD SCHOOL trademark on its website as just one of 44 brands in Respondent's stable.

Respondent's unfamiliarity with Kuhlman's claimed sales is inconsistent with its purported interest in licensing or selling the OLD SCHOOL trademark. On one hand, Respondent claims that it "licensed" OLD SCHOOL to Kuhlman to purportedly avoid an abandonment of the mark until such time as Respondent could license or sell the trademark to a retailer who would exploit its potential. On the other hand, Respondent has no data to share with a potential licensee or purchaser to support the potential of the OLD SCHOOL trademark. Respondent does not have any sales records, nor did Johnston make any notes of his "discussions" with Kuhlman.[220]

---

[216] Johnston Discovery Dep., pp. 55-56 (39 TTABVUE 60-61).

[217] Johnston Discovery Dep., p. 108 (39 TTABVUE 113); Johnston Discovery Dep., p. 92 (40 TTABVUE 94) (improperly designated confidential) ("Well, I mean, that's my business, it's what I do every day, and I'll discuss it at sort of a high level to see if there's interest and then, you know, follow up. When did I start doing that? I started doing that the week after we bought it.").

[218] Johnston Discovery Dep., p. 93 (40 TTABVUE 95) (improperly designated confidential).

[219] Johnston Discovery Dep., p. 93 (40 TTABVUE 95). Johnston has done a pitch book for OLD SCHOOL but did not introduce it. *Id.* at pp. 93-94 (40 TTABVUE 95-96).

[220] Johnston Discovery Dep., p. 22 (39 TTABVUE 27); Johnston Testimony Dep., p. 97 (83 TTABVUE 100) (Respondent does not have any records of Kuhlman's sales of OLD SCHOOL

Respondent has not seen any records regarding the sales of OLD SCHOOL clothing products by Kuhlman.[221] Respondent does not know how much OLD SCHOOL clothing Kuhlman has sold,[222] nor does Respondent have first-hand knowledge that its OLD SCHOOL clothing products are being sold in retail outlets or where they are being sold.[223] Johnston presumes there are continuing sales based on his discussions with Kuhlman.[224]

Assuming arguendo that an "intent not to resume" use can be rebutted by proof of a bona fide intent to license, Respondent acquired the OLD SCHOOL trademark in 2008 and still owns the two registrations of the mark today, more than 10 years later, but the only evidence of Respondent's efforts to license the mark is Respondent's posting the mark on its website for possible interested parties and Johnston's testimony regarding his vague and general plans regarding the OLD SCHOOL trademark.[225]

---

clothing); *id.* at p. 98 (83 TTABVUE 101) (no record of telephone conferences with Kuhlman); *id.* at p. 40 (44 TTABVUE 41) (no sales slips, receipts, invoices, return receipts, alteration slips, shipping documents, or consumer complaints referring to OLD SCHOOL clothing).

[221] Johnston Discovery Dep., p 50 (39 TTABVUE 55). In addition to sales invoices, because Kuhlman "sources" the clothing from Italy, China, and Vietnam, "there would be customs duties records, things like that." *Id.* at pp. 50-51 (39 TTABVUE 55-56).

[222] Johnston Testimony Dep., pp. 96-97 (83 TTABVUE 99-100).

[223] Johnston Discovery Dep., p. 38 (39 TTABVUE 43).

[224] Johnston Discovery Dep., p. 38 (39 TTABVUE 43); Johnston Testimony Dep., p. 97 (83 TTABVUE 100).

[225] Keith Johnston's Testimony Dep., p. 17 (83 TTABVUE 20) (OLD SCHOOL has been posted on Respondent's website since Respondent acquired it in 2008).

Keith Johnston also testified that he has offered OLD SCHOOL to the TJX Companies, owner of T.J. Maxx and Marshalls, between five and ten times just as a normal course of business. *Id.* at p. 14 (83 TTABVUE 17). However, there is no corroborating testimony or documentary evidence.

"Use" of a mark means "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. "Merely because a party has used a mark a long time ago and it could use the mark in the future is not enough to avoid abandonment." *Gen. Motors Corp. v. Aristide & Co., Antiquaire de Marques*, 87 USPQ2d 1179, 1183 (TTAB 2008).

> A proprietor who temporarily suspends use of [a] mark can rebut the presumption of abandonment by showing reasonable grounds for the suspension and plans to resume use **in the reasonably foreseeable future** when the conditions requiring suspension abate. But a proprietor may not protect a mark if he discontinues using it for more than 20 years and has no plans to use or permit its use in the reasonably foreseeable future. A bare assertion of possible future use is not enough. (Emphasis added).

*Silverman v. CBS Inc.*, 870 F.2d 40, 9 USPQ2d 1778, 1783 (2d Cir. 1989) (citations omitted) (emphasis added). *See also Emergency One Inc. v. Am. FireEagle Ltd.*, 228 F.3d 531, 56 USPQ2d 1343, 1348 (4th Cir. 2000) ("Once the challenger shows discontinued use, the owner must produce evidence of intent to resume use 'within the reasonably foreseeable future.' ... Of course, what is meant by the 'reasonably foreseeable future' will vary depending on the industry and the particular circumstances of the case ... it might be reasonable for a fire truck manufacturer to spend five or six years considering the reintroduction of a brand, even though the same passage of time would be unreasonable for a maker of a more ephemeral product, say potato chips.");[226] *Gen. Motors Corp.*, 87 USPQ2d at 1183 ("The fact that

---

[226] Respondent did not introduce any testimony or evidence regarding a "reasonably foreseeable future" for reintroducing a trademark in the apparel field.

brands in the automobile industry are sometimes re-introduced does not exempt the industry in toto from the normal statutory presumption that trademarks can become abandoned and that trademark owners must have an intent to resume use and an explanation for any nonuse. … Opposer has not submitted any evidence that convinces us that, after a sixty-five year hiatus, it has any serious intent to reintroduce a LASALLE vehicle that was last marketed prior to America's involvement in World War II.").

The facts in this case are akin to the facts in *Yazhong Investing Ltd. v. Multi-Media Tech. Ventures, Ltd*., 126 USPQ2d 1526 (TTAB 2018). In *Yazhong Investing*, defendant's witness testified that defendant's mark was in use and remained in use from 2008 through 2011 but defendant did not introduce any evidence of that use. The witness also testified, without corroboration, that he and defendant's predecessors made efforts to advertise, promote and license defendant's mark by participating in trade shows, seeking licensing partners, sponsoring community and sporting events and advertising in magazines and journals. The Board was unimpressed holding "Respondent cannot rely upon mostly unsubstantiated assertions of vaguely defined efforts, apparently conducted without an operating budget, to license goods and services in order to keep someone else from adopting a mark it has abandoned." 126 USPQ2d at 1539.

While Johnston testified that he has received inquiries about the OLD SCHOOL trademark, he has not executed any agreements because no one has made an offer

that has "knocked [his] socks off,"[227] or a "no-brainer" offer[228] such as a $100 million offer.[229] Therefore, Johnston is content with the deal he has with Kuhlman to purportedly try to keep the mark alive.[230] Johnston waits for the deal that will make him rich man, but the Trademark Act does not provide a warehouse for unused marks. *Imperial Tobacco*, 14 USPQ2d at 1394. As the Eleventh Circuit has explained:

> The proper inquiry is whether [the putative mark owner] intended to resume meaningful commercial use of the mark, not whether it intended to abandon the mark. Trademark rights flow from use, not from intent to protect rights. Were the rule otherwise, a party could hold trademarks that it never intended to use but did not want to allow others to use. The Lanham Act does not permit such warehousing of trademarks.

*AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1 USPQ2d 1166, 1177 (11th Cir. 1986).

We find Johnston's testimony regarding his efforts to license or sell the OLD SCHOOL trademark as too general and too vague to establish Respondent had an intent to resume use of the OLD SCHOOL mark in the ordinary course of trade in the reasonably foreseeable future, rather than to reserve a right in the mark until the right deal to license it sell it outright came along. *See Imperial Tobacco*, 14 USPQ2d at 1394 (Fed. Cir. 1990) ("[T]he Lanham Act was not intended to provide a warehouse for unused marks."). *See also Hornby v. TJX Cos.*, 87 USPQ2d 1411, 1421 (TTAB 2008) (petitioner failed to provide any evidence about her plans to

---

[227] Johnston Discovery Dep., p. 101 (39 TTABVUE 106).

[228] *Id.*

[229] *Id.*

[230] *Id.* As we held above, Respondent did not successfully rebut Petitioner's prima facie case of abandonment based on non-use for more than three consecutive years.

resume use of the mark in the United States); *L & J.G. Stickley, Inc. v. Cosser*, 81 USPQ2d 1956, 1967 (TTAB 2007) (after a 28-year period of nonuse, petitioner's statement that he was holding the mark "in esteem" was not sufficient to demonstrate that petitioner had a bona fide intent to use the mark).

Respondent argues that its efforts to police the OLD SCHOOL mark, including filing seven oppositions based on Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), demonstrate Respondent's intent to resume use.[231] The oppositions are listed below:

● Opposition No. 91269165, filed May 5, 2021, against Serial No. 90227707 for the mark BRING IT. OLDSCOOL for "clothing, namely, t-shirts and hats";[232]

● Opposition No. 91256435, filed June 17, 2020, against Serial No. 88752282 for the mark OSO OLD SCHOOL OUTDOORS and design for a variety of goods and services other than clothing;[233]

● Opposition No. 91243047, filed August 15, 2018, against Serial No. 87686728 for the mark OLD SCHOOL SUPPLY CO. and design for, inter alia, "Beanies; Hats; Jackets; Pants; Shirts; Shorts; Socks; Graphic T-shirts; Hooded sweat shirts; Long-sleeved shirts; T-shirts";[234]

● Opposition No. 91245942, filed January 21, 2019, against Serial No. 88051553 for the mark OLD SCHOOL SURF COMPANY for "Bottoms as clothing; Footwear; Hats; Headwear; Sandals; Sneakers; Socks; Swimsuits; T-shirts; Tops as clothing; Underwear";[235]

---

[231] Applicant's Brief, pp. 18 and 38-39 (89 TTABVUE 19 and 39-40) (citing 67-74 TTABVUE). Five of the oppositions were decided by default and two were decided when the applicant withdrew the applications as to the goods in Class 25.

[232] 67 TTABVUE.

[233] 68 and 74 TTABVUE. Respondent filed this notice of reliance twice.

[234] 69 TTABVUE.

[235] 70 TTABVUE.

● Opposition No. 91240274, filed March 26, 2018, against Serial No. 87629648 for the mark OLD SCHOOL ASPEN for "Jackets; Pajamas; Pants; Shirts; Shorts; Socks; Sweatshirts; Underwear";[236]

● Opposition No. 91240276, filed March 26, 2018, against Serial No. 87629615 for the mark OLD SCHOOL VAIL for "Hats; Jackets; Pajamas; Pants; Shirts; Shorts; Socks; Sweatshirts; Underwear";[237] and

● Opposition No. 91189285, filed March 16, 2009, against Serial No. 77577526 for the mark OLD SCHOOL, DOIN IT RIGHT! for "Imprinting messages on T-shirts; Imprinting messages on wearing apparel, accessories and mugs; T-shirt embroidering services."[238]

Petitioner introduced eight registrations incorporating the term "Old School" for clothing.[239] The underlying applications for the registrations were filed between 2010 and 2016. Respondent did not oppose any of them. The registrations are listed below:

● Registration No. 4001462 for the mark OLD SCHOOL LONGBOARDS and design for, inter alia, athletic apparel, namely, shirts, pants, jackets, footwear; belts; bottoms; khakis; ties; tops; and shirts;[240]

● Registration No. 4317763 for the mark GO OLD SCHOOL for, inter alia, polo shirts, shirts, sweat shirts and t-shirts;[241]

● Registration No. 4335628 for the mark OLD SCHOOL TIMBER for, inter alia, jackets, pants, shirts and footwear;[242]

● Registration No. 4174391 for the mark OLD SCHOOL MALIBU for, inter alia, jackets, shorts, sweaters, and tops;[243]

---

[236] 71 TTABVUE.

[237] 72 TTABVUE.

[238] 73 TTABVUE.

[239] Lay Rebuttal Decl. ¶ 9 and Exhibits L and M (84 TTABVUE 4 and 131-176).

[240] 84 TTABVUE 131.

[241] 84 TTABVUE 135.

[242] 84 TTABVUE 139.

[243] 84 TTABVUE 145.

● Registration No. 4685300 for the mark OLD SCHOOL CHOPPERS and design for, inter alia, sweaters and motorcycle jackets and rain suits;[244]

● Registration No. 4814729 for the mark OLD SCHOOL BITCHES for, inter alia, bottoms, footwear, jackets, tops, and women's shirts, dresses, skirts, and blouses;[245]

● Registration No. 4999734 for the mark OLD SCHOOL PLAYA for, inter alia, jackets, pants, shirts, shoes and socks;[246] and

● Registration No. 5221118 for the mark OLD SCHOOL ● NEW SCHOOL ● GET SCHOOLED and design for, inter alia, shirts and athletic apparel, namely, shirt, pants, jackets, and footwear.[247]

Respondent argues that it "opposed *all* the marks it believed to be confusingly similar to its own OLD SCHOOL marks."[248]

We find that Respondent's enforcement efforts do not establish that it had the intent to resume use of the OLD SCHOOL mark during the three-year period of non-use. First, Respondent filed only Opposition No. 91189285 before Petitioner filed this petition for cancellation. The other six were filed after Petitioner filed this petition for cancellation.

Second, there is no evidence that Respondent successfully prosecuted "cease-and-desist" incidents with potential infringers in the marketplace or successfully initiated court proceedings to stop any alleged infringement. Respondent's concern about third-party registrations and simultaneous lack of concern about third-party use in the marketplace is inconsistent with an intent to re-enter the marketplace.

---

[244] 84 TTABVUE 149.

[245] 84 TTABVUE 153.

[246] 84 TTABVUE 156.

[247] 84 TTABVUE 159.

[248] Respondent's Brief, p. 39 (89 TTABVUE 40).

Third, while Respondent argues that it filed oppositions against the marks in applications it believed to be confusingly similar to its own OLD SCHOOL mark, we note that Respondent filed oppositions against OLD SCHOOL VAIL and OLD SCHOOL ASPEN but not OLD SCHOOL MALIBU. This begs the question why OLD SCHOOL VAIL and OLD SCHOOL ASPEN are likely to cause confusion with Respondent's OLD SCHOOL trademark but not OLD SCHOOL MALIBU.

Finally, although Johnston testified that Respondent actively enforced its trademark rights, he was unaware what Respondent actually did to enforce them.

> Q.   Did you ever take any active enforcement measures against one of these infringers?
>
> A.   Always.
>
> Q.   Can you describe the nature of the actions you took?
>
> A.   Did we ever file any objections?
>
> [Respondent's counsel – I will check]
>
> A.   I don't know. I'm sorry.
>
> Q.   So you don't recall?
>
> A.   I don't recall.[249]

Respondent filed an opposition in 2009 and then went nine years without policing its mark in the USPTO.[250] It resumed filing oppositions only after these proceedings began. Based on these circumstances, we find that Respondent's enforcement efforts

---

[249] Johnston Discovery Dep., p. 87 (39 TTABVUE 92).

[250] As noted above, Petitioner introduced eight registrations of OLD SCHOOL-formative marks for clothing that issued between 2010 and 2016 that Respondent could have opposed but did not.

are not persuasive, and that Respondent may well have filed the post-2017 notices of opposition simply to bolster its defense to the abandonment claim.

### D.   Conclusion

We find that Petitioner has shown by a preponderance of the evidence that Respondent failed to use its OLD SCHOOL mark after Respondent acquired the mark in the Harold's bankruptcy liquidation auction in 2008 and intended not to resume use. Therefore, Respondent abandoned the mark in the two registrations involved in these proceedings.

Having found that Respondent abandoned the OLD SCHOOL trademark for nonuse with no intent to resume use, we need not decide the claims of abandonment based on an assignment in gross, an invalid assignment, or naked licensing. *Azeka Bldg. Corp. v. Azeka*, 122 USPQ2d 1477, 1478 (TTAB 2017) (Board has "discretion to decide only those claims necessary to enter judgment and dispose of the case" as its "determination of registrability does not require, in every instance, decision on every pleaded claim."); *Weider Publ'ns, LLC v. D&D Beauty Care Co.*, 109 USPQ2d 1347, 1361 (TTAB 2014) (Board, after sustaining opposer's Section 2(d) claim, did not consider opposer's dilution by blurring claim, *appeal dismissed per stipulation*, No. 2014-1461 (Fed. Cir. Oct. 10, 2014)).

**Decision:** We grant the petitions for cancellation on the sole ground of abandonment.

Registration Nos. 1387606 and 1915132 will be cancelled in due course.